427 S.E.2d 899 (1992)
Rick GRAY d/b/a Patriot's Point Gulf, Respondent,
v.
SOUTH CAROLINA DEPARTMENT OF HIGHWAYS AND PUBLIC TRANPORTATION, Appellant.
No. 1874.
Court of Appeals of South Carolina.
Heard February 19, 1992.
Decided October 5, 1992.
Order on Rehearing March 29, 1993.
*900 Ellison D. Smith, IV, and Richard D. Bybee, Smith & Bundy, Charleston, and Asst. Chief Counsel Natalie Moore, S.C. Dept. of Highways and Public Transp., Columbia, for appellant.
S. Jahue Moore, Kirkland, Taylor, Wilson, Moore, Allen & Deneen, West Columbia, for respondent.
CURETON, Judge:
This inverse condemnation case arose when the South Carolina Department of Highways and Public Transportation closed the intersection of Grand Street and U.S. Highway 17 by-pass in Mt. Pleasant, South Carolina, in 1989. The jury awarded Rick Gray damages of $162,000 for the taking of his property. The Department appeals. We affirm in part, reverse in part and remand.

FACTS
From 1978 to 1989 Gray operated a prosperous service station on the west side of Grand Street where it intersected with U.S. 17 by-pass near Mt. Pleasant. Gray occupied the property under a renewable sublease from Gulf Oil Company (now British Petroleum Company), which was due to expire on December 31, 1989. Gulf's lease ran until December 31, 1998. In August, 1989, the Department closed the intersection, denying Gray and his customers access to Grand Street as it ran in a southwesterly direction.
Before November, 1956, Grand Street (then Mathis Ferry Road) ran in a northerly and southerly direction. In November, 1956, the South Carolina Department of Highways and Public Transportation condemned the necessary property for the right-of-way of U.S. 17 by-pass. The rightof-way for the by-pass ran in an easterly and westerly direction. After November, 1956, U.S. 17 Mt. Pleasant by-pass was constructed over Grand Street. The intersection remained open and Gray's service station was built around 1978 on the west side of Grand Street where it intersected with U.S. 17 by-pass.
When the Grand Street intersection was closed in 1989, new intersections to the east and west of Grand Street were opened. In doing this, a new configuration of roads was opened, resulting in Grand Street being severed and that part to the north of the by-pass becoming a spur ending in a cul-de-sac where Gray's service station was located.

ISSUES
The issues raised by the Department in this appeal are (1) whether there has been a taking of Gray's property for which he is entitled to compensation and (2) whether there is any evidence to support the jury's award of damages in the amount of $162,000.

DISCUSSION

I.

A.
With respect to the issue of taking, the Department first argues its motion for directed verdict should have been granted because it had the right to eliminate the intersection in the exercise of its police *901 powers. Our Supreme Court has held that a governmental body may, pursuant to its police powers, regulate the use of property to prevent serious public harm. See, Richards v. City of Columbia, 227 S.C. 538, 88 S.E.2d 683 (1955). Although there was evidence that the closing of the intersection was for safety reasons and the closing had reduced the number of accidents at the area, the evidence is less compelling that the modifications were needed to prevent serious public harm. Most road improvements like the one in question, have safety as a purpose. Any suggestion that most takings of property are not compensable merely because they have safety as a purpose would be untenable. See, Houston v. Town of West Greenville, 126 S.C. 484, 120 S.E. 236 (1923) (the exercise of a municipality's police powers will not be allowed to violate Article 1, § 17 of the State Constitution which provides that private property shall not be taken for public use without just compensation). The issue was properly presented to the jury.

B.
The Department next argues that, pursuant to S.C.Code Ann. § 57-5-1010 et seq., when the right-of-way for U.S. 17 bypass was acquired in the 1956 condemnation proceeding, the then owners were compensated for the denial of access to Mathis Ferry Road as it ran in a southerly direction across and over U.S. 17 by-pass.
The records before us establish that the intersection of Mathis Ferry Road and the U.S. 17 by-pass around Mt. Pleasant was not closed upon the implementation of the plans existing in 1956. In 1956 the Highway Department, when preparing to condemn property for a controlled access road, prepared a detailed "Plan and Profile of the Proposed Road." This Plan and Profile was required by statute to be filed with the Highway Department and to be made available to all owners of land on whom a Notice of Condemnation was served. The Notice of Condemnation in this case incorporated Plan No. 10.439 which identified the property to be condemned for the right-of-way for U.S. 17 by-pass around Mt. Pleasant, South Carolina. Plan No. 10.439 contains 81 sheets of detailed plans. Sheet No. 24 of Plan 10.439 is a drawing showing that U.S. 17 by-pass around Mt. Pleasant would intersect with and cross Grand Street and the intersection would remain open. The plan envisioned additional paving to facilitate its use as an intersection. In other words, the 1956 condemnation was based on Department plans that showed the intersection remaining open. The continuation of the intersection and its benefits to a landowner situated in one of its busy quadrants must necessarily have been considered in establishing value. The Department is bound by its 1956 plans regarding what property rights were then taken as well as what benefits were then bestowed upon the then owner of the subject property.
Although S.C.Code Ann. §§ 57-5-1010 through XX-X-XXXX (1976), give the Department authority to regulate and prohibit access to controlled-access facilities and to eliminate and control the creation of intersections, they do not provide that the Department may regulate and prohibit access and eliminate and control the creation of intersections without the payment of compensation if the action of the Department effects a taking of property.
In South Carolina Highway Department v. Allison, 246 S.C. 389, 143 S.E.2d 800 (1965), the Supreme Court held that an abutting landowner was entitled to compensation for the loss of access to an existing highway when a controlled access facility was constructed on top of it. The Court stated that an abutting property owner has a right of access over an existing road adjacent to his property as an appurtenance thereto. Consequently, an obstruction that materially injures or deprives the abutting property owner of access for ingress or egress to and from his property is a "taking" of the property for which recovery may be had.
After the 1956 condemnation in this case, the then owners of the subject property still had a right of access to U.S. 17 by-pass and that part of Mathis Ferry Road running to the south of the subject property. *902 Gray enjoyed the same right of access under his sublease of the property, starting in 1978. The property was denied this access when the intersection was closed in 1989. There was, therefore, a "taking" at that time for which Gray was entitled, under authority of Allison, to compensation.

C.
Finally, the Department argues the elements of an inverse condemnation are not present in this case because there has been no physical entry upon Gray's property. According to the Department, Gray's real complaint is that he has lost business because the diversion of traffic makes the subject site unsuitable for a service station. The Department contends Gray has no right to be compensated for lost business.
The elements of an inverse condemnation are (1) an affirmative, positive, aggressive act on the part of the governmental agency, (2) a taking, (3) the taking is for a public use, and (4) the taking has some degree of permanence. Rolandi v. City of Spartanburg, 294 S.C. 161, 363 S.E.2d 385 (Ct.App.1987). The only element in dispute here is that of "a taking".
Both parties rely upon the case of South Carolina State Highway Department v. Carodale Associates, 268 S.C. 556, 235 S.E.2d 127 (1977) to support their arguments. In Carodale, a portion of the landowner's property was acquired for an exit ramp off 1-77 in Richland County. A portion of U.S. Highway # 1, fronting on the landowner's property prior to the condemnation, was relocated creating a cul-de-sac in front of the landowner's land. Access to the relocated highway is afforded by the construction of a connecting street. During trial, the Department objected to testimony relating to "diversion of traffic and loss of frontage on the highway." After noting a landowner has no vested right in the continuation of a public highway or the maintenance of traffic on such a highway, the Court noted that the "vacation of a street or the creation of a cul-de-sac with the concomitant diversion of traffic and loss of frontage has been held a `taking' of property", citing City of Rock Hill v. Cothran, 209 S.C. 357, 40 S.E.2d 239 (1946). The Court concluded, however:
Closing a street inherently produces a diversion of traffic and loss of frontage on a viable traffic artery. However, these repercussions are not compensable elements of damage. Succinctly, the restriction of ingress or egress to and from one's property is the right which must be compensated if infringed when a highway is closed by condemnation.
Carodale, 235 S.E.2d at 129.
The Court reversed the trial court and remanded for a new trial because "testimony relating to alleged damages for which restitution is not recognized at law" was admitted.
The applicability of Carodale to this case is far from clear. In Carodale, unlike this case, a portion of the landowner's property was condemned. Where a portion of a tract of land is taken for public use, the landowner is entitled to compensation not only for the value of the land taken but, also for any "special damages resulting to the remainder thereof". South Carolina State Highway Department v. Bolt, 242 S.C. 411, 131 S.E.2d 264 (1963). The real issue in Carodale appears to have been whether the relocation of the road adversely affected the value of landowner's remaining property so as to require compensation. The Court did not directly address that issue.
Here, there was no physical taking of a portion of the property in which Gray had a leasehold interest.[1] The difference *903 between a condemnation where a portion of the landowner's property is taken and one where no land is taken is illustrated in J. Sackman, 4A Nichols on Eminent Domain as follows:
There is a distinction, however, to be noted between the assessment of compensation in the case of a taking and in the case of damage when no land is taken. In the former case, the mere fact that there has been a taking entitles the owner to recover for all damages to his remaining land (whether special or shared by the general public), provided they flow from the taking, since he is constitutionally entitled to be made whole for all injuries resulting from the taking of his land. But when there is no taking, he is entitled only to such damages * * * which are special and peculiar.
Id., Section 14.27 at p. 14-730.
Not all damages suffered by a private property owner at the hands of a governmental agency are compensable. Some damages suffered to private property are damnum absque injuria. An injury for which damages must be paid is injury to the property itself. The property itself must suffer some diminution in substance, or be rendered intrinsically less valuable by reason of the public use. 26 Am.Jur.2d Eminent Domain, Section 160 (1966). To warrant a recovery, the damage must be different in kind and not merely in degree from that sustained by the public generally. See, City of Rock Hill v. Cothran supra; see, 26 Am.Jur.2d Eminent Domain, Section 160 (1966); see also, J. Sackman, 4A Nichols on Eminent Domain, Section 14.27 p. 14-730; cf. 11 E. McQuillin, The Law of Municipal Corporations, Section 30.192 at 140, 141 (citing City of Rock Hill v. Cothran for the proposition that "in all jurisdictions, including those where [it is required that affected property abut on a portion of the street vacated to be compensable], it is undoubtedly true that if it appears that there is a special injury, the owner may recover damages notwithstanding his property does not abut on the part of the street vacated").
In Cothran, the Court stated the "right of a landowner to recover damages because of the vacation of a street depends on the location of his land with reference to the street vacated, or the part of the street vacated, and the effect of such vacation on his rights as an abutting owner." Id. 40 S.E.2d at 243.
Further, the test is, not whether the property abuts, but whether there is a special injury, and the first practical question which presents itself is whether one whose property does not abut immediately on the part of the street vacated * * * is so specially injured as to be entitled to recover compensation on the ground that his access is cut off in one direction, but not in the opposite direction.
Id. 40 S.E.2d at 243-244. The Court concluded the trial court erred in enjoining the landowner from proceeding in a common law action to recover damages for the taking of his property, although, as here, the governmental action of closing one end of the street had not affected his ingress and egress to the closed street. In addressing the question of special injury, the Court stated:
It is alleged that prior to the action taken by City Council, appellants' property fronting on Laurel Street was so situated that it was available as lots for business purposes, but that after the action of the city, it was rendered useless for that purpose. If this be true, then the taking would result in special injury.
Id. 40 S.E.2d at 244; accord, 26 Am.Jur.2d Eminent Domain § 242 (1966) ("many courts hold that an owner is entitled to compensation where all access from his property to the system of streets in one direction is, cut off").
Under the Cothran decision, the lack of a physical entry upon Gray's leasehold is not dispositive of the "taking" issue. The critical question was whether the closing of the intersection affected the value of Gray's property in some special way not *904 common to other property in the area. The evidence showed Gray's property abuts on the intersection that was closed. There was also testimony that before the intersection was closed the most profitable use of Gray's leased premises was for the operation of a service station. Gray's property was peculiarly suited for this use because of its location at the intersection. Thus, there was evidence from which the jury could find that he was specially damaged when the intersection was closed, cutting off his access to U.S. 17 by-pass and the southwest portion of Grand Street. A landowner is entitled to compensation on the basis of the most advantageous and profitable use of his land. Bolt, supra. If he is deprived of that use, it is irrelevant to argue, as the Department does, that there is no taking because the land can still be put to other uses.

II.
The Department also argues that, assuming there was a taking, the damages should be reversed because they represent Gray's loss of business, not the reduction in the value of his property due to the elimination of the intersection. At issue is whether the capitalization of earnings method of appraising real property was properly utilized in this case.
The general rule is that the value of a business being conducted upon property condemned may not be a component of the market value of the property. Bolt, supra. However, the fact that a business is being conducted on the property should be considered in determining the value of the real estate, if in fact the business enhances the property's value. Id. Thus, while it is permissible to utilize the capitalization of earning method, it is the earnings from the property that must be capitalized, not the earnings from the business. See, J. Sackman, 5 Nichols on Eminent Domain, § 19.01, p. 19-8 (under the income approach, an appraiser calculates the economic rent the property will command in the open market, deducts normal operating expenses to arrive at net operating income and then capitalizes the net operating income by a rate of return to arrive at an opinion of fair market value). See also, Wine v. Commonwealth, 301 Mass. 451, 17 N.E.2d 545, 120 A.L.R. 889 (1938) (the damages recoverable for shutting off access to a service station from the public highway system by barricades at intersections are to be measured not by the loss of business as business, but by any diminution of the value of the real estate involved in reference to the uses for which it was adopted). In valuing a leasehold interest, the measure of damages is the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew the lease, less the rent which the tenant would pay for such use and occupancy. Hamilton v. Martin, 270 S.C. 223, 241 S.E.2d 569 (1978). See Annotation, Eminent Domain: Measure and Elements of Lessee's Compensation for Condemnor's Taking or Damaging of Leasehold, 17 A.L.R.4th 337, § 3 (1982).
The jury had before it evidence that the highest and best use of the property before the Department closed the intersection was as a service station. There was also evidence that the property was no longer valuable as a service station after the intersection was closed. In addition, there was evidence that Gray could have renewed his sublease until December 31, 1998, when Gulf's lease expired. Thus, the jury could have found that the closing of the intersection in August, 1989, deprived Gray of the property's highest and best use for a remaining period of 113 months.
In conformity with the formula in Hamilton, the Department introduced evidence that the property had an income producing potential (market rent) of approximately $400.00 more per month than Gray pays under his lease (contract rent) with Gulf. Assuming Gulf was required to renew Gray's lease for the entire 113 month period remaining on its prime lease with the fee owner of the property, Gray's maximum recovery under the Hamilton valuation formula would be approximately $45,200.[2] *905 Because the capitalization of earnings method used by Gray's expert witnesses was erroneous as a matter of law[3], and because the maximum compensation Gray could have recovered under the Department's evidence would have been over $100,000 less than the jury awarded, we hold there is no evidence to support the amount of the damages awarded by the jury. We, therefore, reverse the damages award and remand for a new trial.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
BELL, J., concurs.
GARDNER, J., dissents in separate opinion.
GARDNER, Judge (dissenting):
I respectfully dissent from the majority opinion insofar as damages are concerned and concur only in the result of the remaining part of the decision.
The better rule and the rule I believe required by the law of this state is that in cases of the condemnation of a leasehold interest, the measure of damages is the market value of the unexpired term of the lease and that the market value can be determined by the capitalization of income method.
There is an annotation entitled, "Eminent Domain: Measure and Elements of Lessee's Compensation for Condemnor's Taking or Damaging of Leasehold" contained in 17 A.L.R.4th at page 338 (1982). This is a lengthy annotation involving 131 pages.
I quote from the summary and comment.
§ 2. Summary and comment
Generally
When property which is being condemned is subject to a leasehold interest, although the right of the lessee to compensation is generally well established, questions arise about what the measure and elements of any such compensation should be.
An examination of the cases concerning the condemnation of a leasehold interest reveals that there is considerable confusion, if not respecting the actual measure to be applied to such a leasehold, then at least respecting the terminology to be used in describing that measure. Generally, the courts, especially in older opinions, have summarily declared the market value of the leasehold taken to be the measure of damages for the taking (§ 3[a], infra). One frequent definition of market value is that price which would be agreed upon at a voluntary sale between an owner willing to sell and a purchaser willing to buy (§ 3[a], infra). However, the courts have frequently refined this broad standard by seeking to set out with more precision what the concept of "market value" entails. Thus, either as a definition of market value or without reference to that term, some courts have expressed the measure of a lessee's damages for a leasehold as the economic rent or fair rental value of the leasehold less the rent reserved under the terms of the lease (§ 3[b]), infra). Still another form which the market value standard has taken in the reported cases describes the measure of damages as the market value of the unexpired term of the lease over and above the rent stipulated to be paid (§ 3[c], infra). Since courts, even within the same jurisdiction, often seem to use a variety of market-value concept definitions, sometimes without apparently distinguishable results, it remains unclear to what extent these different expressions are reflections of real differences. Id.

Note that the lessor is not a party to this inverse condemnation action either by pleading, testimony, or by motion to join *906 the owner as a party to the action. This is not an apportionment action. No question of apportionment was raised. The lease in this case was assignable. I would submit that the only fair measure of damages would be the market value based upon the best use of the property and determined by what the jury believed a willing buyer would pay and a willing seller would accept for the leasehold interest regardless of the market rent. The jury, in this case, was instructed to consider both the formula for damages set forth in Hamilton and also to consider the usual rule in South Carolina for determining the market value of the leasehold interest, i.e., what a willing buyer would give and a willing seller would take based upon the highest and best use for the property. The jury returned a verdict for $162,000. There is adequate evidence of record to support this verdict.
My brothers argue, citing J. Sackman, 5 Nichols on Eminent Domain, § 19.01, p. 19-8, that while it is permissible to utilize the capitalization of earnings method, it is the earnings from the property that must be capitalized, not the earnings from the business. This is contra to the law of South Carolina. In this state, "when land is occupied by a lessee, as in this case, the law of property regards the lease as equivalent to a sale of the premises for the term of the lease. In the absence of an agreement to the contrary, the lessor surrenders possession and control of the land to the lessee." Byerly v. Connor, ___ S.C. ___, ___, 415 S.E.2d 796, 798 (1992).
My brothers misinterpret South Carolina State Highway Department v. Bolt, 242 S.C. 411, 418, 131 S.E.2d 264, 267 (1963). I quote:
Accordingly, the better reasoned cases hold that, although the value of a business which is being conducted upon the real property condemned may not ordinarily be added to the market value of the realty as damages for the taking, the fact that a given business is in operation on the property should be taken into consideration in determining the market value of the real property if in truth it is a factor in establishing that market value  if, that is, the use of the real property for that purpose enhances the value of it. Quoting Housing Auth. of City of Bridgeport v. Lustig, 139 Conn. 73, 90 A.2d 169, 171 (1952). [Emphasis added.]
When Byerly v. Connor and South Carolina State Highway Department v. Bolt are read together, the meaning is clear. Although the loss of a business cannot be added to the market value of the realty as damages for the taking, evidence of the use of the property can be taken into consideration in determining the market value of the property if the use of the property for that purpose enhances the value of it. The emphasized portion of Bolt clearly establishes this. Bolt is clear authority for the proposition that the market value of a leasehold interest in land can be determined, among other methods, by the capitalization of income method of appraisal. Bolt specifically holds that injury to the business being operated on the property taken may properly be considered in determining the fair market value before and after the taking.
In the present case, the trial judge correctly charged the jury as follows:
I charge you that where a leaseholder estate is taken or damaged forfor public use, the major damage to the lessee is the depreciation and value of the leasehold interest or in other words the difference between the value of the leasehold immediately before and immediately after the public improvement for which the land is allegedly taken. [Emphasis added.]
I would hold that the trial judge correctly charged the jury that one method of determining the value of a leasehold interest in this case was the economic rent less the actual rent theory advanced by the majority in this case but that another method would be the fair market value based upon the highest and best use of the property. This would include capitalization of income as a method of evaluating the market value of the property taken.
There is evidence of record to support the verdict awarded by the jury. I would affirm.

*907 ORDER
PER CURIAM:
A motion for rehearing was granted in this case, and the rehearing was held on December 7, 1992. Having considered the petitions for a rehearing, the authorities brought to this court's attention by the parties, and the arguments of counsel, we reject the grounds advanced in both petitions, being unable to discover that any material fact or principle of law has been either overlooked or disregarded in our original opinion. It is therefore ordered that the majority opinion heretofore rendered in this case shall constitute the final opinion of this court.
IT IS SO ORDERED.
BELL and CURETON, JJ., concur.
GARDNER, Justice, dissenting.
I adhere to my dissent. This case involves what I know to be a novel issue in this state and an issue of great importance. I sincerely believe that my dissent represents the better law for this state.
NOTES
[1] 18 Am.Jur. Eminent Domain § 265 cited in South Carolina State Highway Department v. Bolt, supra states:

When part of a parcel of land is taken by eminent domain, the owner is not restricted to compensation for the land actually taken; he is also entitled to recover for the damage to his remaining land. In other words, he is entitled to full compensation for the taking of his land and all its consequences; and the right to recover for the damage to his remaining land is not based upon the theory that damage to such land constitutes a taking of it, nor is there any requirement that the damage be special and peculiar, or such as would be actionable at common law; it is enough that it is a consequence of the taking.
[2] This figure does not factor in the fact that Gray's lease was about to expire, and any renewal of the lease would presumably be at the market rate in existence at the time of the renewal.
[3] One of Gray's experts testified the value of Gray's leasehold was $400,000, less $25,000 for goodwill, or $375,000. The other expert testified the value of Gray's leasehold was $300,000. However, both of these witnesses arrived at their valuations by averaging the earnings from Gray's business for a certain number of years, then capitalizing that average earning figure by a rate of return to arrive at an opinion of value.