523 S.E.2d 193

SEA CABINS ON THE OCEAN IV HOMEOWNERS ASSOCIA-
TION, INC., **Grand Strand Realty, Gerald W. Arney, Mary P. Arney, Bobby McLean, Thelma McLean, Thomas P. Woodruff, Virginia C. Woodruff, Ronald L. Peck, Philip H. Morris, Linda M. Morris, Jack L. Tyson, Shirley S. Tyson, Timmy R. Helms, Thomas Minton, Frank R. Buoniconti, Jeanne L. Buoniconti, Robert A. DeSimone, Jim F. Moore, Jo Mingas Moore, William R. Kennedy, Jr., Hilda B. Kennedy, Steve A. Brock, Gary W. Alphin, W.F. Tugwell, Jr., Ronald D. Hall, Bath Investments Properties, c/o Thomas Myers; David L. Saunders, Ray A. Bolick, Nancy P. Bolick, Elizabeth Kandler Elliott f/k/a Elizabeth A. Kandler, Jimmy L. Love, Etta Love, Charles A. Ginardi, Carol W. Ginardi, Russell L. Pinkelton, R. Steve Metcalf, Ray E. Jennings, L. Derek Herring, William P. Brown, J.P. Batten,**

Jr., Tony Sherrill, Carolyn H. Sherrill, Joseph M. Baker, Martha K. Baker, Don Ferrell, Nancy C. Williamson, Alan H. Branan, Francis G. Logue, Patricia J. Logue, Dominick Mauriello Trust f/k/a Dominick Mauriello and Marjorie Mauriello, John W. Blake, Sharon D. Blake, Bobby Young, Forrest D. Bricker, Robert E. Sease, Jane A. Sease, Howard E. Virkler, Macy L. Hoyle (died 9/13/90), Jane Brendel, Richard Brendel, Stacy Jean Snyder, Fred M. Snyder, Joyce Snyder, Daniel E. Wilson, Wanda M. Wilson, Bobby J. Garrison, Barbara S. Garrison, Hambry Brothers, Inc., Vera G.M. Hankin, Sarah S. McLean, A.F. McLean, Jr., (as trustee for William H. McLean), Estate of Sarah S. McLean f/k/a Sarah S. McLean, Mellon Bank, Phillips E. Powell, Diane F. Powell, Joseph A. Galiano, Denise Galiano, Vincient and Catherine Pastore; Vincient, Jennifer, and Deigo Monticciolo, Charles H. Hammond, J.E. Bobbit, Jr., Wallace Webster Quate, Jr., William Maegruder, Peggy Maegruder, George W. Joyce, Sara Murray Joyce, Reggie Keith Safrit, Martha Stirewalt Safrit, Beach Properties/Linwood Jackson/James R. Bullock, Jr.; Franwell, a partnership, Edward C. McGimsey, Partner, c/o Morganton Hardware Co.; James J. Linden, Alice C. Linden, Kirkland P. Broom, Ann S. Broom, John R. Henderson, Mary Ann Henderson, James T. Grier, Janet R. Grier, Emma H. Valentine, Francisco Valentine, Johnny C. Whitmore, Emma G. Whitmore, Guy A. Walters, Jr., Ann H. Walters, Felder W. West, Jack N. Morris, John E. Varol, Ralph V. Varol, Garland J. Candle, Tony R. Craven, Doloris Craven, Grady Oliver, Carol Oliver, Robert C. Barry, Jr., Jimmie R. Foxx, Eva V. Lewis, Richardo F. Cecchini, Nilda E. Cecchini, Anthony P. Sapienza, Anne M. Sapienza, Clyde R. Randal, Jean M. Randal, Bernard J. Milano, Mary N. Milano, c/o PMM Company, David Steele Jarrett, Kathy Saunders Jarrett, Charles Weir, James Vernon Gross, Dorothy D. Gross, David R. Eva, Judith E. Eva, (Estate of Sarah S. McLean f/k/a Sarah S. McLean), Richard V. Adams, Sherrell Dennis Hedrick, Galileo D. Casquejo, Thomas M. Clayton, Linda B. Clayton, Russell L. Pinkelton, Judy Pinkelton, Stan Halpern, William D. Powell, Patsy Powell, Jerry L. Calvert, Ruth C. Calvert, W.B. Seddinger, Edward Bell, Jr., Mary Lee M. Bell, Myles G. Keery, Sabra L. Keery, Fleming, Francis & Associates, Burl Kenneth Flemming, Alma Jean Flemming, David Frances, Betty L. Frances, c/o Mr. David L. Francis, Larry Peak, James R. McCracken, Max R. Schmidt, Alice V. Schmidt, Delores Randall, Hambry Brothers Concrete, Inc., Richard Link, Ray W. Welsh, Wendy C. Welsh, Bobby L. Tuttle, Thomas T. Archer,

Martha C. Archer, Ted D. Fuller, Nancy K. Fuller, Danny Edwards, Sandra Edwards, Edwin T. Yarborough, Suzanne C. Yarborough, Epworth Children's Home, Dr. A .W. Macklin, James A. Pierce, III, c/o Marietta Pallet Company, E. Wayne Harper, Brabston B. Harper, John G. Hansen, Richard V. Adams, James H. Kirk, Agnes C. Kirk, W. James Dubose, Henry Voznick, Jean H. Voznick, Thomas F. Conn, Madeline Conn, Arlon O. Jones, Charles E. Ramsey, John M. McCoy, Gerald L. Fowler, William R. McAdams, Jerry E. Moats, Fowler Moats, Inc., Chester F. D'Agostina, Janis R. D'Agostina, Wall–Johnson, Leon W. Wall, Joyce B. Wall, A. Gray Johnson, Jo Ann R. Johnson, Jerry McKee, Donna McKee, James E. Messick, Jr., Jean M. Messick, Arnold M. Schwartz, Janice M. Schwartz, Jing Ming Liu, Ellie Y. Lao, Warren Heiser, Mary Ann Heiser, Earl R. Betts, Jr., Carol A. Betts, John R. Stass, Barbara J. Stass, Hardiena J. Smith as personal representative of William B. Smith, Jack M. Ladford, Ila L. Carver, Walter W. Little, Doris H. Russ, Kenneth F. Spainhour, Carolina A. Spainhour, John R. Spies, Alice L. Spies, Randall David Torcasi, Robert Q. Yeckley, Carl S. Sigmon, Louie O. Lavender, Jr., Noble Vaughn, Jr., Cornelia L. Vaughn, Larry D. Procter, Kara P. Proctor, Roy L. Lynam, Donna M. Lynam, Jeffrey Huber, Deborah J. Huber, Emmett Floyd, Kathy Floyd, James Russell Millner, Donald C. Winterich, Richard R. Steinke, Lewis B. Keener, LaFayette F. Decker, Cecelia M. Decker, Anthony L. Buoniconti, Margaret A. Buoniconti, Calvin L. Palmer, Jr., Rosie B. Palmer, Duane Knight, Sharon G. Knight, W. Glenn Jenkins, Charm House Design, Stephen L. Nader, William O. Reeside, Jane S. Reeside, Michael Ray, Cynthia N. Ray, Don A. Ray, Eleanor J. Ray, Cranston Blanks, Jr., Margaret L. Blanks, J.R. Gibbons, Gladys Gibbons, R.M. Glasscox, Cheryl Glasscox, Haracio P. and Martha A. Moreno–Compos, Gerald V. Hull, Emma J. Hull, James B. Davenport, Carolina Land Company, George E. Wells, Robert W. Braam, Maurice W. Brady, Ronald Bittles, Florence Bittles, David Whitley, Michael G. Carovillano, Judith A. Carovillano, John Petrozzi, Thomas F. Murtha, Dorothy A. Murtha, John F. Quinn, Jane H. Quinn, Presbyterian College, c/o Bailey Bank, George W. Wilson, Mark Wilson, Donald M. Bryant, Sandra B. Bryant, Jack Holsclaw, Mary H. Clarke, Valerie H. McRary, Gene S. Clarke, Thomas B. McRary, c/o Skyland Furniture Shoppe, Gerald W. Edmonds, Doris A. Edmonds, Jack S. Brown, Talma L. Brown, David T. McLaughlin, Carol H. McLaughlin, Harry Whitener, Eva S. Whitener, William J. Brennan, Gracia B.J. Brennan, Jerry R. Sutherland, Jo Ann

Sutherland, L.D. Austin Company, Randolph Jones, Frances Jones, Seigfried Abrahams, Harold Langenderfer, Joan M. Langenderfer, Delbert L. and Marianne C. Wolcott, William B. Seddinger, William Harnett, W. Nelson Lewis, Barbara Craven; Helen, Gene, Laurie and Teresia Maye, R.A. Elmore, III, Judy A. Elmore, Rodney Thompson, Mark Cosgrove, Evelyn Cosgrove, Robert Brown, Danny G. Turner, Elaine M. Turner, Harry Anedisian, Louis I. Anedisian, Ferrel G. Camp, Joyce A. Camp, Ruth Fridinger, Stephen C. Cesar, Bonnie L. Cesar, John C. Sanders, Ann Marie Sanders, John R. McClure, Rebecca D. McClure, Jay Elliott Gordon, Faye H. Gordon, Gene S. Edmonds, Helen E. Edmonds, F. Bruce Pearch, Florence Pearch, Carl Spahn, Jr., Debra A. Spahn, Ralph J. DeFillips, Dorothy J. Phillips, Mary R. Trogdon, Linda S. Toleno, Sally Davis, Stanley L. Smith, Doris H. Smith, Gerald W. Krimminger, Joyce A. Krimminger, Anthony P. Sapienza, Anne M. Sapienza, Daniel P. Mageras, Janet A. Mageras, Earl Downing, Sharon B. Downing, Robert V. Steele, Lori Steele, B.L. Sizemore, D. Ann Sizemore, Roger W. Huffman, Patricia W. Huffman, John W. O'Connor, James W. McMaster, Lana McMaster, Thomas L. Herb, Joy V. Herb, James W. McArthur, Theodore M. Cooley, Ralph W. Pope, Wallace H. Burgess, Gordon McCoy, Mary J. McCoy, John F. Barna, John Capito, Jr., Margaret B. Capito, Harry W. Wayne, David A. Dunlap, Elizabeth Stover, Americo R. Caggiano, Viola Catherine Caggiano, W.B. Seddinger, Reggie K. Safrit, Lori Anne Boyle, Linda Boyle, Fredrick J. Saleeby, Reid S. Saleeby, John G. Underwood, Jr., M/M Edward Gregory, Johnny T. Gregory, Randy S. Hammett, DPS Investment, Francis Feltham, Thomas and Eunice Kirby, Joseph Jengehino, Maryann J. Jengehino, Allan Warrington, Greenville Progressive Womens Investment Club, Robert A. Jackson, Richard Arvonio, Cherry Grove Sales, Inc., Frederick S. Carter and Patsy S. Carter, Respondents,

v.

CITY OF NORTH MYRTLE BEACH, Appellant.

No. 3050.

Court of Appeals of South Carolina.

Heard Sept. 10, 1999.

Decided Oct. 4, 1999.

Rehearing Denied Dec. 25, 1999.

384

See also 828 F.Supp. 1241.

W. Cliff Moore, III, of Ellis, Lawhorne & Sims; William H. Davidson, II, and Andrew F. Lindemann, both of Davidson, Morrison & Lindemann, all of Columbia, for appellant.

Newman Jackson Smith, of Nelson, Mullins, Riley & Scarborough, of Charleston, for respondents.

ANDERSON, Judge:

This is a takings and inverse condemnation case. Sea Cabins on the Ocean IV Homeowners' Association, Inc. and numerous owners of units in the homeowners' association (Sea Cabins) filed this action against the City of North Myrtle Beach alleging a taking and condemnation of their private pier. The Master–in–Equity found a taking had occurred and awarded Sea Cabins $900,000.00 in compensation. The City appeals. We reverse.

## FACTS/PROCEDURAL BACKGROUND

Sea Cabins was created by master deed in 1980 pursuant to the South Carolina Horizontal Property Regime Act, S.C.Code Ann. § 27–31–10, *et seq.* (1976). One of the common elements of Sea Cabins was a fishing pier that extended approximately 900 feet into the ocean. The pier was built with authorization under Act 499, 1955 S.C. Acts 1083–1084. On September 21, 1989, Hurricane Hugo damaged a significant amount of the pier.

In a letter dated February 20, 1990, the City informed Sea Cabins it was considering the adoption of an ordinance to declare the remaining portion of the pier a nuisance. The resolution, adopted on March 6, 1990, stated the pier would be removed if it was not repaired. Several extensions were requested and granted for the repair of the pier.

On April 9, 1990, the City passed the Beach Franchise Ordinance, which required a license agreement be entered into with the City as a condition for obtaining a building permit. The agreement being negotiated between Sea Cabins and the City required the pier be open to the public. On June 28, 1990, Sea Cabins instituted an action in the United States District Court against the City. The action sought declaratory and injunctive relief and damages under 42 U.S.C. § 1983 and the United States and South Carolina Constitutions.

On July 22, 1992, United States District Judge C. Weston Houck ruled the Beach Franchise Ordinance was invalid as it applied to Sea Cabins. Other federal theories were tried on

May 17 and 18, 1993. Judge Henry Coke Morgan entered an order on July 29, 1993, finding Sea Cabins had property rights in the pier, and acknowledging the invalidity of the Beach Franchise Ordinance. The Court held the remaining issues in abeyance until all state remedies have been exhausted.

On August 16, 1990, subsequent to the filing of the federal action, the City returned the plans and permit application to Sea Cabins, after the Zoning Administrator found the pier had been destroyed, not just damaged. The Zoning Board, the Circuit Court, and the South Carolina Court of Appeals affirmed the Zoning Administrator's ruling. This Court granted Sea Cabins' petition for rehearing, withdrew the original opinion, and filed a new opinion holding there was no evidence supporting the Zoning Board's finding the pier was more than 75% damaged or destroyed. The South Carolina Supreme Court denied the Zoning Board's petition for writ of certiorari on December 20, 1993.

This action was commenced on August 12, 1993. Sea Cabins averred the ordinances and actions of the City and its officials resulted in a taking of the pier. Sea Cabins sought compensation based upon inverse condemnation of their property. The City answered raising multiple defenses.

The City issued Sea Cabins a permit on April 19, 1994. After several revisions, construction and repair of the pier commenced on October 10, 1994. The pier was completed in June of 1995.

At trial, the Master–in–Equity awarded judgment of $900,-000.00 to Sea Cabins. The City filed a motion to alter or amend pursuant to Rules 52(b) and 59(e), SCRCP. After a hearing, the Master issued an additional order on February 24, 1997, partially amending his original order. The City appeals.

### ISSUES [1]

Is a temporary taking compensable for inverse condemnation where the property owners have not been deprived of "all economically viable use" of their property?

---

1. The City raised a total of 20 issues on appeal. Since the reversal is based solely on the first issue, we need not address the remaining issues.

## STANDARD OF REVIEW

An action brought by a property owner against a municipality for the taking of the owner's property without just compensation is an action at law. *South Carolina Public Service Authority v. Arnold*, 287 S.C. 584, 340 S.E.2d 535 (1986); *Poole v. Combined Utility Sys.*, 269 S.C. 271, 237 S.E.2d 82 (1977). Since this action was referred to the Master–in–Equity for final judgment with direct appeal to the Supreme Court, this Court will correct any error of law. We must affirm the Master's factual findings unless there is no evidence reasonably supporting them. *Crary v. Djebelli*, 329 S.C. 385, 496 S.E.2d 21 (1998); *King v. PYA/Monarch, Inc.*, 317 S.C. 385, 453 S.E.2d 885 (1995). *Townes Assoc. Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E.2d 773 (1976).

## LAW/ANALYSIS

The City argues Sea Cabins' claims of inverse condemnation must fail as a matter of law because the ordinances and actions only took the pier and not all uses of the property. Further, the City maintains since it was only a temporary taking, "all economically viable use" must be taken before it becomes compensable. We agree.

### I. Recognition of a Cause of Action for a Temporary Taking

The United States Supreme Court first recognized that a temporary taking effectuated by regulation could be compensable in the case of *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). According to the Court, "temporary takings which ... deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation." *Id.* at 318, 107 S.Ct. 2378. The Court referred to Justice Brennan's dissenting opinion in *San Diego Gas & Electric Co. v. San Diego*, 450 U.S. 621, 657, 101 S.Ct. 1287, 1307, 67 L.Ed.2d 551 (1981): "Nothing in the Just Compensation Clause suggests that 'takings' must be permanent and irrevocable." The Court further noted: "Invalidation of the ordinance ..., though converting the taking into a 'temporary' one, is not a

sufficient remedy to meet the demands of the Just Compensation Clause." *First English Evangelical Lutheran Church,* 482 U.S. at 319, 107 S.Ct. 2378.

The United States Supreme Court elucidated with clarity the doctrine of temporary takings in the case of *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The 1988 Act that constituted a taking in the *Lucas* case was amended prior to the decision of the South Carolina Supreme Court. However, the Court decided to rule on the merits and held no taking of any kind existed. *See Lucas v. South Carolina Coastal Council,* 304 S.C. 376, 404 S.E.2d 895 (1991). The United States Supreme Court stated:

This unusual disposition does not preclude Lucas from applying for a permit under the 1990 amendment for future construction, and challenging on takings grounds, any denial. But, it does preclude, both practically and legally, any takings claim with respect to Lucas's past deprivation, i.e., for his having been denied construction rights during the period before the 1990 amendment. *See generally First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (holding that temporary deprivations of use are compensable under the Takings Clause).

*Lucas,* 505 U.S. at 1011–1012, 112 S.Ct. 2886.

On remand of *Lucas,* the Court explicated: "Accordingly, the remand of this case from the United States Supreme Court has created for Lucas a cause of action for the temporary deprivation of the use of his property, unless Coastal Council can demonstrate that Lucas's intended use of his land was not part of the bundle of rights inhering in his title." *Lucas v. South Carolina Coastal Council,* 309 S.C. 424, 427 424 S.E.2d 484, 486 (1992). This Court in *Staubes v. City of Folly Beach,* 331 S.C. 192, 198, 500 S.E.2d 160, 164 (Ct.App. 1998), *cert. granted,* March 3, 1999, relying on the federal cases described above, held very succinctly: "Temporary takings are as protected by the Constitution as are permanent ones."

## II. Inverse Condemnation

Sea Cabins brings this action for recovery of damages from the alleged inverse condemnation of their fishing pier. The elements of an action for inverse condemnation were set out in *Gray v. South Carolina Dept. of Highways and Public Transp.*, 311 S.C. 144, 427 S.E.2d 899 (Ct.App.1992): (1) an affirmative, positive, aggressive act on the part of the governmental agency; (2) a taking; (3) the taking is for a public use; and (4) the taking has some degree of permanence. Sea Cabins contends through the adoption of the Beach Franchise Ordinance, the Nuisance Resolution, and the other actions of the City, there is a claim for the inverse condemnation of the pier. The City asseverates Sea Cabins has failed to meet the requisite degree of permanence in the fourth element of *Gray*. We agree.

The City makes two arguments. The first is the alleged taking was only temporary; therefore, Sea Cabins cannot meet the fourth requirement. We disagree. If a *compensable* temporary taking has occurred, it can have the requisite degree of permanence as required by the fourth element of *Gray. See Lucas, supra.*

The second is if a temporary taking is to be recognized for inverse condemnation purposes, it must meet the requirements of a *compensable* temporary taking as set out in *First English Evangelical Lutheran Church* and *Lucas*. Sea Cabins claims federal law should not apply. However, because South Carolina has recognized compensable temporary takings, due to federal law, it is appropriate to utilize the analysis found in the federal cases.

Sea Cabins relies on *Lucas* in support of its argument that the fourth element is met due to the length of time involved, from March 1990 through October 1994. In *Lucas*, the Court found inverse condemnation for a four year taking. Nevertheless, the period of the taking is not the important consideration. The *causa sine qua non* of the taking in *Lucas* is the property owner be deprived of "*all economically viable use.*"

Prior to *Lucas*, only permanent takings were considered for inverse condemnation. Since the courts of this state

have recognized temporary takings through *Lucas* and *Staubes*, they are now considered for inverse condemnation. However, when deciding if a temporary taking rises to the requisite degree of permanence required by *Gray*, the court must find a compensable temporary taking. The analysis for a compensable temporary taking must be juxtaposed with the fourth element in *Gray* in adjudicating if the actions of the City qualify as inverse condemnation.

### III. Ownership of the Pier

When one views whether property was taken, the analysis is based upon the "parcel as a whole". *See Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The taking must be of the entire parcel and not just one portion. In the case *sub judice*, the ownership of the pier must be resolved, as well as the extent of the parcel to be analyzed.

The pier was considered a common element as defined in the Horizontal Property Act of South Carolina. S.C.Code Ann. § 27–31–30(f) (1991). The trial court agreed the pier was a common element. Relying on the Master Deed, deeds from the Horry County Courthouse, rental documents from various rental companies, and documents from homeowners including tax returns, the trial court concluded: "Plaintiffs are the owners of the Sea Cabins pier, a common element of the Sea Cabins on the Ocean IV Property Regime."

Sea Cabins admitted the pier was a common element. In their brief, Sea Cabins acknowledges the losses were from the "taking of a common element of a horizontal property regime. . . . All of the units share equally in the benefits of the pier as it has been rebuilt."

The federal courts found the pier was a common element owned by all the homeowners. The trial court said: "The federal court ruled that the Sea Cabins pier is an appurtenance to the real estate above the high water mark and it is indisputably owned by the plaintiff. The Court further found that the pier is a common element of the horizontal property regime."

Having found the pier is a common element, we look to ownership of the common elements in a horizontal property

regime. The trial court stated: "The common element pier is an indivisible part of each homeowner[']s property. For the purposes of this present condemnation action, each apartment with its share of the common elements is a single parcel of property." Pursuant to The Horizontal Property Act:

An apartment owner shall have the exclusive ownership of his apartment and shall have a common right to share, with the other co-owners, in the common elements of the property, equivalent to the percentage representing the value of the individual apartment, with relation to the value of the whole property.

S.C.Code Ann. § 27–31–60(a) (1991). Sea Cabins' Master Deed provides: "Ownership of a Unit includes title to an apartment and an undivided interest in the Common Elements and the Common Surplus." The pier is not "a property interest in and of Itself." A percentage of the pier, as a common element, is obviously encapsulated in the "bundle of sticks" belonging to each individual homeowner. The parcel owned by each homeowner encompasses his share of the pier, and other common elements, as well as the individual residence.

## IV. Parcel as a Whole

■ Analyzing actions of governmental entities to determine if a compensable taking has occurred, we view the portion taken in relation to the "parcel as a whole." *See Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Sea Cabins directs our attention solely to the pier to ascertain what was taken. However, the pier is not a discrete segment of the property that is owned. Our focus is on the parcel as a whole.

In *Penn Central,* the Supreme Court instructed:

'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole.

438 U.S. at 130–131, 98 S.Ct. 2646. The Court repeated this fundamental analysis in *Concrete Pipe and Products, Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993). In that case, Concrete Pipe argued: "The property of [Concrete Pipe] which is taken, is taken in its entirety." *Id.* at 643, 113 S.Ct. 2264. The Supreme Court in *Concrete Pipe* expounded:

> [W]e rejected this analysis years ago in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 130–131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978), where we held that a claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question. *Accord, Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987) ("[O]ur test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, [and] one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction' ") (citation omitted).

508 U.S. at 643–644, 113 S.Ct. 2264.

The trial court held the pier was taken by the actions of the City. However, the appropriate query is not whether the pier was taken in its entirety, but what portion of the entire property owned by the homeowners was taken. If the entire parcel is not deprived of "all economically viable use," then there is no compensable taking.

Sea Cabins challenges the application of federal cases to the issue in this case. However, the South Carolina Supreme Court, in *Beard v. South Carolina Coastal Council*, 304 S.C. 205, 403 S.E.2d 620 (1991), annunciated:

> It is important to note at the outset that the Beards' complaints concern only a portion of their property.... As an initial matter, the Beards' approach to a "takings" contention in the context of a zoning regulation is inaccurate.

" 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated.... [The] Court focuses rather ... on the ... parcel as a whole." (Citing *Penn Central, supra.*)

*Beard,* 304 S.C. at 207–208, 403 S.E.2d at 622. Using the "parcel as a whole" analysis, the *Beard* Court denied compensation where only a portion of the land was taken and the remaining land was still used by the property owners.

## V. Takings Analysis/"All Economically Viable Use"

Sea Cabins contends we should not look to federal law, but only to state law to determine if a compensable temporary taking has occurred. However, the only South Carolina cases recognizing temporary takings have relied on the federal takings analysis in *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). *See Lucas v. South Carolina Coastal Council,* 309 S.C. 424, 424 S.E.2d 484 (1992); *Staubes v. City of Folly Beach,* 331 S.C. 192, 500 S.E.2d 160 (Ct.App.1998), *cert. granted,* March 3, 1999.

The City professes a property owner must be "deprived of all economically viable use of its property," before the deprivation can be compensable. We agree.

In *Staubes,* this Court cited *First English Evangelical Lutheran Church* and *Lucas* for the proposition that a landowner must be deprived of "all use of his property" before a temporary taking is compensable. *Staubes,* 331 S.C. at 199, 500 S.E.2d at 164.

In *First English Evangelical Lutheran Church,* the United States Supreme Court held:

'[T]emporary' takings which ... deny a landowner *all* use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation....

. . . .

... We also point out that the allegation of the complaint which we treat as true for purposes of our decision was that the ordinance in question denied appellant *all* use of its property....

. . . .

... Here we must assume that the Los Angeles County ordinance has denied appellant *all* use of its property for a considerable period of years, and we hold that invalidation of the ordinance without payment of fair value for the use of the property during this period of time would be a constitutionally insufficient remedy.

482 U.S. at 318–22, 107 S.Ct. 2378 (emphasis added).

The Court in *Lucas* noted the importance of the property owner being deprived of all use of his property. *Lucas* edifies as follows: "[T]he Fifth Amendment is violated when land-use regulation 'does not substantially advance legitimate state interests or *denies an owner economically viable use of his land.'*" *Lucas*, 505 U.S. at 1016, 112 S.Ct. 2886 (quoting *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)) (emphasis in original). The Court averred:

We think, in short, that there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking.

*Id.* at 1019, 112 S.Ct. 2886 (footnote omitted) (emphasis in original).

The *Lucas* Court observed:

Where the State seeks to sustain regulation that deprives land of *all economically beneficial use*, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. This accords, we think, with our "takings" jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the "bundle of rights" that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; "[a]s long recognized, some values are en-

joyed under an implied limitation and must yield to the police power." *Pennsylvania Coal Co. v. Mahon,* 260 U.S., [393] at 413, 43 S.Ct., [158] at 159 [67 L.Ed. 322 (1922) ]. . . . In the case of land, however, we think the notion pressed by the Council that title is somehow held subject to the "implied limitation" that the State may subsequently eliminate *all economically valuable use* is inconsistent with the historical compact recorded in the Takings Clause that has become part of our constitutional culture.

*Id.* at 1027–1028, 112 S.Ct. 2886 (emphasis added) (footnotes omitted).

This Court applied the deprivation of "all economically beneficial use" standard in *McQueen v. South Carolina Coastal Council,* 329 S.C. 588, 496 S.E.2d 643 (Ct.App.1998). Citing *Lucas* for approval of the standard that the landowner must be deprived of "all economically beneficial use" before a taking is compensable, the Court explicated:

McQueen testified that he is unable to do anything with either lot, including park a boat on one. The only use of the land available to McQueen after the permit denials the Council could show was "[r]ecreational, aesthetic use" that the Council's own expert testified is "really probably not directly recreational." The Council employee conceded that the recreational value to McQueen is "kind of indirect," stating, "I don't think Mr. McQueen would like everybody to come out there to crab or fish on his lots." This use does not truly benefit McQueen. We hold McQueen has suffered a textbook taking.

*McQueen,* 329 S.C. at 600, 496 S.E.2d at 650.

In *Staubes v. City of Folly Beach,* 331 S.C. 192, 201, 500 S.E.2d 160, 165–66 (Ct.App.1998), *cert. granted,* March 3, 1999, this Court found: "In this case, the City's actions did not deprive Staubes of all economically viable use of his land. . . . Even though Staubes may not have been able to use his property as he desired, this limitation does not rise to the level of a constitutional taking."

## VI. Application of Takings Analysis to Sea Cabins

■ The City maintains the homeowners at Sea Cabins have not been deprived of "all economically viable use" of their

property, and therefore, they have not suffered a compensable temporary taking. We agree.

The trial court failed to address this issue in its original order. The City filed a motion to alter or amend pursuant to Rules 52(b) and 59(e), SCRCP, requesting the trial court to address the defense and make appropriate findings of fact and conclusions of law. The trial court responded:

> The first alleged defense appears to be a regulatory takings argument. However, this defense does not appear in defendant's Answer. Defendant's arguments that its interpretation of federal authority precludes an inverse condemnation when only the pier is taken is not persuasion [sic].

A defendant is not required to plead in its answer the defense that the plaintiff has not been deprived of all economically viable use. The burden is upon the plaintiff to prove the temporary taking has occurred and is compensable. One of the elements that must be proven is the temporary taking deprived the property owner of "all economically viable use" of the property.

The facts of *Staubes v. City of Folly Beach*, 331 S.C. 192, 500 S.E.2d 160 (Ct.App.1998), *cert. granted*, March 3, 1999, are remarkably similar to the instant case. Staubes owned a rental apartment building which was damaged by Hurricane Hugo. He was originally granted a building permit for repairs. However, if the property was damaged by more than 50 percent then Staubes could not rebuild unless the construction met the new requirements. Staubes' property was found to be more than 50 percent damaged and therefore a condemnation order was issued requiring him to meet the City's new construction requirements.

Staubes appealed the decision to the Zoning Board of Adjustment and the circuit court, both of which upheld the revocation of the permit. This Court reversed stating there was no evidentiary support for the finding of more than 50 percent damage. Staubes then brought the action against the City of Folly Beach alleging:

> [T]he City's actions prevented him from performing any repairs on the property, leaving the property uninhabitable and unrentable during the appeal process. He averred the

City's conduct deprived him of all beneficial use of the property without just compensation.

*Id.,* 331 S.C. at 196, 500 S.E.2d at 163.

The *Staubes* Court enunciated:

In this case, *the City's actions did not deprive Staubes of all economically viable use of his land.* Never in this dispute did the City inform Staubes he could not rebuild his house under any circumstances. Rather, the City informed Staubes he was required to comply with applicable building codes before he repaired his house. In his deposition, Staubes conceded that if he had complied with the applicable building codes in January of 1991, he could have rented the building on either a monthly or weekly basis. Staubes claimed he could have rented the house for prices that houses rented for in brochures he offered as exhibits. These prices ranged from $600 a week to $1,695 a week during the summer. Staubes had an economically viable use of the building available to him; albeit, he chose not to use it. *Even though Staubes may not have been able to use the property as he desired, this limitation does not rise to the level of a constitutional taking.*

Because Staubes was not deprived of *all* economically viable use of his property, the City's actions did not result in an uncompensated taking of Staubes's property.

*Staubes,* 331 S.C. at 201–02, 500 S.E.2d at 165–66 (emphasis added).

Under the applicable standard of review, we peruse the record to determine if there is *any evidence* showing a deprivation of *"all economically viable use"* caused by the actions of the City. The property involved is the entire unit owned by the homeowners and not just the pier itself. Each unit is used for its own individual purpose: a primary residence; vacation property; rental property; or business property.

The record contains the testimony of many members of the homeowners' association that owned units during the time of the alleged taking. David Whitley, a homeowner, testified regarding his use during the alleged taking:

Q. Now, from 1990 to 1994 did you use that unit?

A. Did I personally use it?

Q. Did you personally use that unit?

A. I'm sure I did. Yes.

Q. Did you rent that unit?

A. Some portion of that time.

Q. Can you tell me what portion?

A. I think I stopped renting my unit in 1991.

Q. So in 1990 and 1991 you did rent?

A. I believe that is true, yes.

. . . .

Q. So the fact that the pier was not there didn't stop you from using your unit, did it?

A. It did not stop me from using my unit, no.

This is one example of a homeowner who was able to rent his unit and retain an economically viable use while the pier was not allowed to be rebuilt. Another property owner, Alexander Macklin, provided testimony concerning the amounts he received in rent in 1994 and 1995. During the alleged taking, he received lower rental income, however, his property was rented in 1992 and 1994. While he may not have received the amount he desired, Macklin was not deprived of *all* economic benefit.

Sea Cabins' expert witness testified the damages to the plaintiffs were loss of rents. The expert calculated the amounts by examining 44 units which were rented before and during the alleged taking and comparing the value of the income. Obviously, his testimony shows the units still retained some economic value. Other homeowners testified to buying their units during the time of the alleged taking, demonstrating the units retained some value, unlike the property in *Lucas* and *McQueen.*

It is not just the pier that has to be taken. The pier is but one piece of the whole. The entire value of the property owned by the homeowners must be taken by the actions of the City before a compensable temporary taking results. Sea Cabins acknowledged in its brief: "If the entire condominium complex were taken instead of just the pier, the rental value lost would be much greater." We find *no evidence* Sea Cabins was deprived of *"all economically viable use "* of its property.

## VII. CONCLUSION

We hold a compensable temporary taking did *not* occur under the *First English, Lucas,* and *Staubes* analysis. The homeowners at Sea Cabins were *not* deprived of "all economically viable use" of their property. While the pier could not be utilized as desired, and some homeowners may have suffered lower than expected returns, the homeowners continued utilizing their property in an economically beneficial manner. We rule the City's actions did *not* constitute an inverse condemnation of the homeowners' property under *Gray.*

Accordingly, the decision of the Master–in–Equity is

**REVERSED.**

GOOLSBY and CONNOR, JJ., concur.