641 S.E.2d 437

John A. HARDIN and Martha Hardin Curran, as Trustees
of Marital Trust 2 under the will of Martha S.
Hardin, Deceased, Respondents,

v.

The SOUTH CAROLINA DEPARTMENT
OF TRANSPORTATION, Petitioner.

and

Elisha B. Tallent, d/b/a Elisha's California Hair, Respondent

v.

The South Carolina Department of Transportation, Petitioner.

No. 26262.

Supreme Court of South Carolina.

Hardin heard April 5, 2006.
Tallent heard May 2, 2004.
Decided Feb. 12, 2007.
Rehearing Denied March 8, 2007.

Linda C. McDonald and Beacham O. Brooker, Jr., both of Columbia, and Robert L. Widener, of McNair Law Firm, of Columbia, for Petitioner.

David A. White, of Robinson, Bradshaw & Hinson, of Rock Hill, for Respondents.

Andrew F. Lindemann, of Davidson Morrison & Lindemann, of Columbia, and Danny C. Crowe, of Turner Padget Graham & Laney, of Columbia, for Amicus Curiae Municipal Association of South Carolina.

Richard D. Bybee, of Smith Bundy Bybee & Barnett, of Mt. Pleasant, for Amicus Curiae South Carolina Landowners Association.

Robert E. Lyon, Jr., and M. Clifton Scott, both of the South Carolina Association of Counties, of Columbia, for Amicus Curiae South Carolina Association of Counties.

Robert Clyde Childs, III, of Greenville, for Respondent.

Chief Justice TOAL:

These cases deal with the issue of whether and to what degree realignments and closures of public roads constitute "takings" within the meaning of Article I, § 13 of the South Carolina Constitution and the Fifth Amendment to the United States Constitution. Lower courts separately determined that the property owners in both *Hardin* and *Tallent* suffered takings as a result of actions of the South Carolina Department of Transportation (SCDOT). We reverse.

### FACTUAL/PROCEDURAL BACKGROUND

In light of our disposition of these two appeals, we engage in only a brief review of the facts.

### A. *Hardin*

Dave Lyle Boulevard is a high-speed, divided, controlled-access highway connecting the City of Rock Hill to Interstate Highway 77. No private driveway has direct access to the highway. Instead, private driveways exit onto side roads which have intermittent access to the highway. The highway has a number of turn lanes in the median which allow traffic to cross the median and access the many intersecting surface streets.

The plaintiffs own two properties that are located on the north side of Dave Lyle Boulevard. The properties sit on either side of the highway's intersection with Garrison Road. For several years, this intersection contained a break in the median which runs down Dave Lyle Boulevard. This break allowed vehicles at the intersection to access both Garrison Road and the highway in either direction. In 1998, the City of Rock Hill requested that SCDOT construct a new intersection approximately 1,000 feet east of the existing intersection to

accommodate an industrial park and a technical college. SCDOT advised that creating a new intersection would require that the Garrison/Dave Lyle intersection be closed due to the limitations of cross streets on the highway. After a public hearing, SCDOT consented to the construction of the new intersection. As a result, SCDOT closed the break in the median at the Garrison/Dave Lyle intersection. This prevented vehicle traffic from making any left turns at the Garrison/Dave Lyle intersection.

In 2001, the plaintiffs filed an inverse condemnation action against SCDOT alleging that depriving the traffic leaving their properties the ability to cross Dave Lyle Boulevard constituted a taking for which the plaintiffs were owed compensation. The trial court ruled that the plaintiffs suffered a compensable taking, and the court of appeals affirmed. *See Hardin v. South Carolina Dep't of Transp.*, 359 S.C. 244, 597 S.E.2d 814 (Ct.App.2004).

## B. *Tallent*

In this case, the plaintiff purchased a tract of property located on Old Easley Bridge Road near Greenville. The plaintiff opened and operated a hair salon and tanning studio on the property. At the time she purchased the property, the property had access to Highway 123 via Old Easley Bridge Road. As the roads were then aligned, Old Easley Bridge Road split off Highway 123 as a tangent and gradually curved to intersect White Horse Road, which runs perpendicular to Highway 123.

Sometime after the plaintiff purchased the property, SCDOT began construction of a controlled-access "diamond" interchange at the intersection of Highway 123 and White Horse Road. This re-configuration involved closing access points between Old Easley Bridge Road and White Horse Road. Specifically, SCDOT closed Old Easley Bridge Road to through traffic, removed a traffic light, and made several cosmetic changes along the road. These changes altered the character of Old Easley Bridge Road from a through-connecting surface street to a road ending in a cul-de-sac.

As in *Hardin*, the plaintiff brought an inverse condemnation action against SCDOT. Using the fact that the road re-

configuration situated her property on a cul-de-sac and limited her access to Highway 123 by requiring her to navigate a series of secondary roads running through low income neighborhoods, the plaintiff alleged SCDOT had "taken" her property. The plaintiff alleged the road re-configuration decreased her property value and resulted in her business being less accessible to the public (and thus less valuable). The trial court ruled that the plaintiff suffered a compensable taking, and the court of appeals affirmed. *See Tallent v. South Carolina Dep't of Transp.*, 363 S.C. 160, 609 S.E.2d 544 (Ct.App.2005).

### LAW/ANALYSIS

As we have previously held, a plaintiff's right to recovery in an inverse condemnation case is premised upon the ability to show that he or she has suffered a taking. *Byrd v. City of Hartsville*, 365 S.C. 650, 657, 620 S.E.2d 76, 80 (2005). Although it has been recognized that the existence of property interests are often determined by reference to sources such as state law, *see Georgia v. Randolph*, 547 U.S. 103, 126 S.Ct. 1515, 1540, 164 L.Ed.2d 208 (2006) (Scalia, J., dissenting), South Carolina courts have embraced federal takings jurisprudence as providing the rubric under which we analyze whether an interference with someone's property interests amounts to a constitutional taking. *Byrd*, 365 S.C. at 656 n. 6, 620 S.E.2d at 79 n. 6 (citing *Westside Quik Shop, Inc. v. Stewart*, 341 S.C. 297, 306, 534 S.E.2d 270, 275 (2000)).

Both Article I, § 13 of the South Carolina Constitution and the Fifth Amendment to the United States Constitution provide that private property shall not be taken for public use without the payment of "just compensation."[1] Although the takings clause was once understood to apply only to a direct appropriation of property or the functional equivalent of an ouster of possession, it is now universally accepted that regulations which control or limit the use of property can "take" the property in the constitutional sense. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014, 112

---

[1]. The Fifth Amendment's takings clause applies to the actions of state governments through the due process clause of the Fourteenth Amendment to the United States Constitution. *Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 241, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

S.Ct. 2886, 120 L.Ed.2d 798 (1992) (reviewing nineteenth century takings jurisprudence); *see also Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 122 n. 2, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *and Byrd* 365 S.C. at 656, 620 S.E.2d at 79.

Although no set formula exists for determining whether property has been "taken" by the government, the relevant jurisprudence does provide significant guideposts. Determining whether government action effects a taking requires a court to examine the character of the government's action and the extent to which this action interferes with the owner's rights in the property as a whole. *Penn Central*, 438 U.S at 130–31, 98 S.Ct. 2646. Stated more specifically, these "ad hoc, factual inquiries" involve examining the character of the government's action, the economic impact of the action, and the degree to which the action interferes with the owner's investment-backed expectations. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (quoting *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646); *Byrd*, 365 S.C. at 658–59, 620 S.E.2d at 80 (quoting the same). Generally, the physical occupation of private property by the government results in a taking regardless of the public interest the government's action serves. *See Loretto*, 458 U.S. at 426–28, 102 S.Ct. 3164; *see also Lucas*, 505 U.S. at 1015, 112 S.Ct. 2886. Additionally, the enforcement of a government regulation will usually effect a taking when the regulation denies all economically beneficial or productive use of land. *Lucas*, 505 U.S. at 1015, 112 S.Ct. 2886.

In the instant cases, it is instructive to begin by classifying the nature of the government's actions which the property owners allege give rise to takings. Neither *Hardin* nor *Tallent* involves the enactment of any regulation which directly regulates any use of the owners' properties. Thus, in order to have "taken" any part of these properties, SCDOT must have physically appropriated some aspect of them. Determining this question requires that we analyze what property interests exist with reference to the public road system and a property owner's access thereto.

In some jurisdictions, a property owner merely has an easement for the purpose of accessing the public road system. Therefore, as long as a property owner has access to the public road system, his easement is intact. For this reason, any road re-configuration that does not cut off an owner's access to the public road system effects no taking upon him.

In South Carolina, however, a property owner has more rights. As we have held, a property owner in South Carolina has an easement for access to and from any public road that abuts his property, regardless of whether he has access to and from an additional public road. *South Carolina State Hwy. Dep't v. Allison,* 246 S.C. 389, 393, 143 S.E.2d 800, 802 (1965). Thus, for example, in South Carolina, an owner of a corner lot has an easement for access to and from both roads that abut his property. Of course, an owner in South Carolina also has an easement for access to and from the public road system. This principle provides that an owner whose property does not abut any public road will not be denied access to the public road system.

In finding that takings occurred in these cases, the court of appeals relied on this Court's opinion in *City of Rock Hill v. Cothran,* 209 S.C. 357, 40 S.E.2d 239 (1946). In that case, the City of Rock Hill closed a portion of a street which rendered the remaining part of the street a cul-de-sac. *Id.* at 361–62, 40 S.E.2d at 240–41. The property owner of a corner lot which fronted both the cul-de-sac and another street brought an action against the city for a taking, and the trial court ruled in the city's favor. *Id.* at 365, 40 S.E.2d at 242. This Court reversed, stating:

> The right of a landowner to recover damages because of the vacation of a street depends on the location of his land with reference to the street vacated, or the part of the street vacated, and the effect of such vacation on his rights as an abutting owner. It is well settled that an owner is not entitled to recover damages unless he has sustained an injury different in kind and not merely in degree from that suffered by the public at large. If it appears that there is a special injury, the owner may recover damages notwithstanding his property does not abut, as in this case, on the

part of the street vacated, because this amounts to a 'taking.'

* * *

In the absence of special injury, no recovery will be allowed. The test is, not whether the property abuts, but whether there is a special injury, and the first practical question which presents itself is whether one whose property does not abut immediately on the part of the street vacated—the part vacated being in the same block between his property and the next connecting cross street—is so specially injured as to be entitled to recover compensation on the ground that his access is cut off in one direction, but not in the opposite direction.

*Id.* at 368–69, 40 S.E.2d at 243–44.

*Cothran* is representative of a line of cases which provide that the closing of a portion of a road abutting a piece of private property necessarily constitutes some degree of a taking of that property. *E.g., Gray v. South Carolina Dep't of Highways and Public Transp.,* 311 S.C. 144, 427 S.E.2d 899 (Ct.App.1992). A critical examination of the property interests at work in these cases, however, yields no plausible explanation for this rule. When only a portion of a public road abutting a landowner's property is closed, leaving the property in a cul-de-sac, no taking has occurred. As long as the owner has access to and from the remainder of the road that continues to abut his property, his easement with respect to that road remains intact. Further, as long as a landowner still has access to the public road system, this easement is unaffected.[2] This reasoning is in line with the notion that a landowner has no right to access abutting roads in more than one direction. *See* 73 A.L.R.2d 689, 691–698.

---

**2.** Returning to the corner lot example, the natural extension of this analysis is that if the government were to entirely close one of the roads that abutted the owner's property, there would be no taking. This is exactly correct. The existence of the road was the condition that created the easement, not the other way around. So long as a landowner has access to the public road system, his easement by necessity is intact. The easement for access to the (now closed) abutting road has not been taken, it has been extinguished.

. This Court came very close to expressing this analysis in another similar case. In *South Carolina State Highway Dep't v. Carodale Assoc.,* this Court stated:

> A landowner has no vested right in the continuance of a public highway; the abandonment of a highway, without its being closed, is *damnum absque injuria.* Likewise, the State is under no duty to maintain a minimum level of traffic flow. Nonetheless, the vacation of a street or the creation of a cul de sac with the concomitant diversion of traffic and loss of frontage has been held a "taking" of property.

> Closing a street inherently produces a diversion of traffic and loss of frontage on a viable traffic artery. However, these repercussions are not compensable elements of damage. Succinctly, the restriction of ingress or egress to and from one's property is the right which must be compensated if infringed when a highway is closed by condemnation.

> The landowner has no property right in the continuation or maintenance of the flow of traffic past its property. Traffic on the highway, to which they have access, is subject to the same police power regulations as every other member of the traveling public. Re-routing and diversion of traffic are police power regulations.

268 S.C. 556, 561, 235 S.E.2d 127, 128–29 (1977) (emphasis in original, internal citations omitted).

 Though it does not expressly provide so, *Carodale* implicitly recognizes that road closings and re-alignments are actions of a far different character than government conduct which affects an owner's rights in his or her property in a constitutionally significant sense. Stated in doctrinal terms, modern takings principles instruct that road closings and realignments which do not "take" land or an easement from a property owner do not give rise to compensable takings because these actions do not directly interfere with an owner's rights in the property as a whole.[3]

---

3. The dissent attempts to take us to task for "ignoring well-established precedent" in reaching our decision. Of course, we do not ignore precedent as the dissent suggests; we expressly overrule it.

This Court's prior decisions holding that the closing of a road constituted a taking actually imply that a property owner possesses more than an easement; they imply possession of a property interest in the existence of a particular public road. That cannot be correct. *See Tuggle v. Tribble,* 177 Ark. 296, 6 S.W.2d 312, 314 (1928) (not passing on the takings issue, but finding that a landowner can have no vested interest in the existence of an abutting road); *cf. Carodale,* 268 S.C. at 561, 235 S.E.2d at 128–29 (stating that a landowner has no vested rights in the continuance of a public highway and in the continuation of maintenance of traffic flow past his property). Thus, to the extent the rationale for these holdings was that the government had caused the owner to lose a property right, this reasoning collapses on itself.

 As this analysis indicates, the focus of our inquiry must be on a landowner's actual property interests; that is, his easements. We therefore overrule the "special injury" analysis contained in our jurisprudence in this area and specify that our focus in these cases is on how any road reconfiguration affects a property owner's easements. An easement is either taken or it is not. That is the "injury different in kind and not merely in degree" with which we are concerned. Under *Cothran's* legal standard, an owner might prevail in a takings claim despite the fact that all of his relevant property interests—his easements for access—have not been disturbed. Not only was the result in *Cothran* incorrect, its pronouncement of the law must be abandoned.[4]

---

4. The contrary rule the dissent advances is curious on its own terms. As a primary matter, neither landowner in this case has been deprived of ingress or egress to his or her property, nor have these landowners been injured in their ability to enter or exit their property. Instead, these cases involve alterations to the road system which have not disturbed the landowners' easements of access. Government action can effect no taking unless it has deprived an owner of a property interest. To the degree that the dissent's analysis focuses on particular uses to which landowners put their property and the change of a property's use-driven value following alterations in the public road system, the dissent suggests that a significant economic impairment of a landowner's expectations may give rise to a taking. This analysis puts the cart before the horse and overlooks the critical factor in these cases which is the character of the government's action. No property rights of these owners have been taken or directly interfered with. To find a taking in either of these cases would be to stretch reason beyond reality.

610

■ Because the plaintiffs in *Hardin* continue to have access to and from Dave Lyle Boulevard and the public road system, their property rights have not been disturbed. The ability to turn only one way onto the boulevard is irrelevant. We therefore reverse the court of appeals' decision and hold that there has been no taking in this case.

■ Similarly, no aspect of the *Tallent* plaintiff's property has been physically taken by SCDOT. Accordingly, we reverse the court of appeals' decision and hold that there has been no taking in this case.

## Conclusion

For the foregoing reasons, we reverse the court of appeals' decisions in these cases.

BURNETT and PLEICONES, JJ., concur. WALLER, J., concurring in part, dissenting in part in a separate opinion in which MOORE, J., concurs.

Justice WALLER, concurring in part, and dissenting in part:

I concur in part and dissent in part.

Although I concur in result with the majority's holding that Hardin has not suffered a compensable taking, I disagree with the rationale underlying its decision. Further, I disagree with the majority's conclusion that Tallent has not suffered a compensable taking.

In my view, the majority ignores well-established precedent and then, without direct citation of authority, holds that "modern takings principles instruct that road closings and realignments which do not "take" land ... do not give rise to compensable takings because these actions do not directly interfere with an owner's rights in the property as a whole." To the contrary, it has long been the law of this state that an actual physical taking of property is not necessary to entitle one to compensation. *Gasque v. Town of Conway,* 194 S.C.

15, 8 S.E.2d 871 (1940), *overruled on other grounds McCall v. Batson*, 285 S.C. 243, 329 S.E.2d 741 (1985) (to deprive one of the ordinary beneficial use and enjoyment of property is, in law, equivalent to the taking of it, and is as much a "taking" as though the property itself were actually appropriated).

As this Court noted in *South Carolina State Highway Dep't v. Allison*, 246 S.C. 389, 393, 143 S.E.2d 800, 802 (1965), "an obstruction that **materially injures or deprives the abutting property owner of ingress or egress to and from his property is a 'taking'** of the property, for which recovery may be had. The fact that other means of access to the property are available affects merely the amount of damages, and not the right of recovery."

I agree with the majority that *City of Rock Hill v. Cothran*, 209 S.C. 357, 40 S.E.2d 239 (1946) was wrongly decided upon its facts and should therefore be limited. In *Cothran*, the plaintiff's property did not directly abut the closed portion of the road, such that there was no direct denial of ingress or egress. Cothran was not deprived of one of the immediate means of access to his property. Accordingly, under the facts of *Cothran*, the plaintiff suffered, at best, a diversion of traffic flow which, as the majority points out, this Court has recognized is not compensable. *Carodale* (landowner has no property right in the continuation or maintenance of the flow of traffic past its property).[5]

However, in my view, the fact that a diversion in traffic flow is not compensable does not mean that closure of a road which **materially deprives the abutting property owner of ingress or egress to and from his property** is not a compensable taking. *See* 46 Am.Jur. *Proof of Facts* 3d 493 § 17 (2004) (courts have often noted important distinction between a limitation of access, which may be compensable, and a change in traffic flow, which is not compensable).

---

5. It has been noted that although a loss of traffic, loss of business, and circuity of travel are not themselves compensable, they are factors to be considered in determining the reasonableness of the remaining access to and from an abutting roadway. *Cady v. N.D. Dep't of Transp.*, 472 N.W.2d 467 (N.D.1991).

On the facts of the *Hardin* case, I agree with the majority that there has been no taking. Hardin's property does not directly abut the median which was closed by the Department of Transportation, and he was not materially deprived of ingress or egress to and from his property. Accordingly, I concur in result only with *Hardin*.

I dissent from the majority opinion's holding in *Tallent*. In Tallent's [6] case, as a result of SDCOT's closure of access points between Old Easley Bridge Road and Highway 123, Old Easley Bridge Road was rendered a cul de sac at one end, the end used by Tallent and her customers to access her salon. Tallent's only remaining access to Highway 123 was by means of a series of secondary roads running through a low-income neighborhood. Due to the closure, the value of the residential properties increased, while the value of Tallent's commercial property decreased.

Courts have generally held, consistent with South Carolina law, that a landowner on a partially closed road, whose land is on the opened portion, cannot claim damages if he still has reasonable access to the general system of roads. There is an exception to this rule, however, if the road closing leaves the landowner in a cul de sac. *Mill Creek Properties v. City of Columbia*, 944 So.2d 67 (Miss.App.2006), *citing Miss. State Highway Comm'n v. Fleming*, 248 Miss. 187, 157 So.2d 792 (1963); *Kick's Liquor Store, Inc. v. City of Minneapolis*, 587 N.W.2d 57 (Minn.Ct.App.1998) (holding that creation of a cul de sac may be compensable if losses of access to and from existing roads "substantially impairs [the landowner's] right to reasonably convenient and suitable access to the main thoroughfare"). *See also DuPuy v. City of Waco*, 396 S.W.2d 103, 110 (Tex.1965) (where construction of viaduct left property owner in cul-de-sac, he was deprived of reasonable access, even though he could still physically get to public roads from his property); *Boehm v. Backes*, 493 N.W.2d 671 (N.D.1992) (Highway Department's construction of overpass that converted street in front of auto repair business into cul-de-sac by closing off direct access to street from nearby highway was a

---

**6.** Tallent's beauty shop was located on Old Easley Bridge Road.

taking; access to business after permanent closure forced use of indirect route of additional four large blocks, through residential neighborhood, distance comparable to six regular city blocks, and this physical interference specially affected property).

Here, the road on which Tallent's business is located has essentially been rendered a cul de sac. In my view, therefore, if Tallent has suffered a special injury, she has a compensable taking.[7]

As noted by the Court of Appeals in this case, "The expert appraiser ... testified that [Tallent's] business losses differed from those in the area because the other entities were 'destination' businesses, such that people will seek them out regardless of the lack of immediate access from Highway 123.... [W]hile the surrounding residential area benefited from the actions of SCDOT, the value of Tallent's commercial property had been adversely affected. The realtor ... testified that there had been no interest in the property due to the current lack of access to Highway 123." *Tallent*, 363 S.C. at 168, 609 S.E.2d at 547. Moreover, the Master indicated that several of Tallent's patrons testified they had difficulty reaching the property since the closure, and were reluctant to do so for safety reasons in driving through the low income neighborhood.

I would affirm the Court of Appeals' holding that Tallent suffered a compensable taking.

MOORE, J., concurs.

---

7. As this Court recognized in *Sease v. Spartanburg*, 242 S.C. 520, 131 S.E.2d 683 (1963), the test of whether a landowner is entitled to recover damages for the vacation of a street is the existence of special injury amounting to a taking.