752 S.E.2d 269

Henry W. FRAMPTON, III, Respondent,

v.

SOUTH CAROLINA DEPARTMENT OF
TRANSPORTATION, Appellant.

Appellate Case No. 2012–209046.

No. 5181.

Court of Appeals of South Carolina.

Heard Sept. 12, 2013.
Decided Oct. 30, 2013.
Rehearing Denied Dec. 19, 3013.

378

Beacham O. Brooker, Jr., of Columbia, for Appellant.

Richard D. Bybee and Michael Brent McDonald, both of Smith Bundy Bybee & Barnett, PC, of Mount Pleasant, for Respondent.

LOCKEMY, J.

In this inverse condemnation case, the South Carolina Department of Transportation (DOT) appeals the judgment in favor of Henry W. Frampton, III. DOT first argues the trial court's decision to seat the jury during the takings phase of the trial was unduly prejudicial and deprived it of a mode of trial to which it was entitled. Additionally, DOT argues (1) Frampton did not prove any facts that would constitute a taking of property; (2) the trial court did not apply the appropriate law in its finding of a taking; (3) the compensa-

tion verdict exceeded any credible evidence of Frampton's loss; and (4) Frampton was not entitled to attorney's fees and costs under the governing statute. We find certain arguments are not preserved for our review, and we affirm the remaining issues.

## FACTS

In 2005, DOT began planning for a bridge improvement project located at Ellis Creek on James Island. The bridge spanned over the property at issue, 699 Folly Road (699 Folly). 699 Folly was located on the north side of and immediately adjacent to Ellis Creek, and it contained a small rental home. Frampton and his wife lived at 693 Folly Road (693 Folly), which was immediately adjacent to 699 Folly, and the Framptons also owned the property at 685 Folly Road (685 Folly). During DOT's initial planning, 699 Folly and 693 Folly existed as one tract of land. The rental home on 699 Folly had always contained a separate driveway and been used as a separate income producing property. During DOT's project, Frampton partitioned the tract of land, creating two separate properties.

Robert Larry Phinney operated as DOT's right-of-way agent[1] during the bridge improvement project, and he testified the original construction plans included a permanent guardrail extending from the bridge and continuing to 693 Folly's driveway. As a result of Frampton's division of his tract of land, the guardrail denied all access between 699 Folly and Folly Road. After Phinney discussed the access issues with DOT's engineers, the engineers explained the length of the guardrail could not be avoided.

To address the access issues, DOT wanted to create a "T" drive, where access to 699 Folly would require entering Frampton's driveway at 693 Folly and then turning ninety degrees into 699 Folly. DOT believed this would provide adequate access. However, Frampton exercised his rights as the landowner and refused to grant DOT any driveway permission to allow access from 693 Folly's driveway to 699 Folly.

---

1. A right-of-way agent uses approved plans to conduct the acquisition process for DOT. The acquisition process includes completing title work of the involved properties, initiating contact with the property owners, and obtaining any necessary permissions.

DOT then refused to exercise its option of condemning Frampton's access rights.

DOT granted Cape Romain Contractors the contract for the project, and construction started in 2007 on the southern side of Ellis Creek at Folly Road. In October of 2008, construction began on the northern side of Ellis Creek immediately adjacent to 699 Folly. A median was ultimately placed in the center of Folly Road though it was not present in the initial plans.

Frampton alleged there were many actions that blocked access from 699 Folly to Folly Road, including the placement of orange construction fencing, silt fencing, and concrete barriers in November of 2008. The concrete driveway that provided access to 699 Folly as well as the adjacent curb and gutter were removed in November and December of 2008. New sewer pipe trenches were excavated and new sewer pipes installed across the former driveway for 699 Folly. DOT constructed a new sidewalk, curb, and gutter in January of 2009 in front of 699 Folly along its boundary line with Folly Road, and Frampton alleged it also blocked all access from Folly Road to 699 Folly. Further, the area in front of 699 Folly and its driveway was used as a "lay down area" for equipment throughout the construction project, which further blocked any access.

Around June of 2009, DOT agreed to shorten the guardrail from the initial length and create a turnaround area for 699 Folly to allow access to Folly Road. However, because concrete for a sidewalk and curb had already been poured in front of 699 Folly's existing driveway, the concrete had to be torn out in order to reestablish access from 699 Folly to Folly Road. DOT finally restored access to 699 Folly in January of 2010 after a series of grading, drainage, and pothole problems were addressed pursuant to state law. *See* S.C.Code Ann. § 57–5–1140 (2006) (setting forth the requirements for installing residential rights-of-way entrances and aprons to state highways).

As a result of the construction activities and access issues, the tenant occupying 699 Folly vacated the premises in October of 2008 before his lease ended. Frampton asserted that DOT's construction and blockage of access to 699 Folly pre-

vented him from renting the home after the tenant vacated the property. Once access was restored, Frampton rented 699 Folly in March of 2010 after a short marketing period. The tenant who vacated 699 Folly during DOT's construction paid Frampton $950 a month in rent. Frampton confirmed that some deferred maintenance was performed on the rental home at 699 Folly during the construction. After the construction was completed, Frampton's tenant paid $1150 a month starting in March of 2010.

Frampton filed his initial summons and complaint on September, 29, 2009, claiming inverse condemnation and constitutional torts, and DOT filed its initial answer on November 3, 2009. On June 17, 2011, DOT filed a motion to transfer the case to the non-jury docket. The trial court denied the motion in a Form 4 order dated September 28, 2011. Frampton amended his complaint on December 14, 2011, and DOT responded by filing an amended answer on February 3, 2012.

At the beginning of the trial, DOT asked the trial court to postpone seating a jury until the trial court decided whether, as a matter of law, a taking had occurred. Until that determination was made, DOT argued a jury trial was improper. The trial court viewed the motion as one to bifurcate the trial into a separate taking and compensation phase and denied the motion.[2] See Cobb v. S.C. Dep't of Transp., 365 S.C. 360, 365, 618 S.E.2d 299, 301 (2005) (explaining that in an inverse condemnation case, the trial court will first determine whether a claim has been established, and then, the issue of compensation may be submitted to a jury at either party's request). The trial court stated it would later determine what issues, if any, would be submitted to the jury.

After both parties' presentation of testimony relating to the alleged taking, the trial court removed the jury from the court room to announce its ruling. Frampton contended as part of the physical taking of his property, he was allowed to argue to the jury that he suffered damages from the median as an incidental part of the whole construction. The trial court rejected his argument and found the median in and of itself was not a taking. Moreover, the trial court stated it did not

---

2. A different judge from the one presiding at trial entered the first denial.

believe Frampton "could piggyback" the issue of the median with the blocking of 699 Folly's access.[3] The trial court then found by a preponderance of the evidence that "the drive to 699 [Folly], the access to 699 [Folly], was blocked by the actions of DOT for sixteen months," from November of 2008 through February 2010. The only issue submitted to the jury was "how much [Frampton] lost as a result of the taking" during the sixteen months.

The trial court proceeded with the compensation phase of the trial and requested the jury be seated again. Frampton qualified a real estate appraiser, Thomas Hartnett, as an expert in real estate and banking, to estimate the damages Frampton incurred from the taking. Harnett acknowledged Frampton leased 699 Folly for only $950 a month prior to the taking and then $1150 a month after the taking, but he testified that contract rent and market rent are two separate calculations and can be different. Harnett testified the market value of 699 Folly was $250,000. Further, he stated eight percent was a fair investment return on 699 Folly, which equaled $20,000 a year, or $1,666.67 a month. He explained that a person would expect an increased return from a rental property versus money deposited in a bank because there are additional costs and risks involved with maintaining a rental property. Harnett estimated Frampton's total loss equaled $26,666.67 for the sixteen months that the access of easement was taken at 699 Folly. Then, Harnett calculated the present value of the total loss using the statutory interest rate of eight percent and stated the loss at present value equaled $31,104. Next, Harnett calculated the present value with a statutory interest rate of eight percent for the invoices reflecting Frampton's costs in relocating and restoring 699 Folly's driveway as well as Frampton's utility bills for the time 699 Folly was vacant, and the damages totaled $4,473.44.

The jury awarded $36,527 in favor of Frampton. DOT filed a 59(e), SCRCP motion arguing the trial court erred in (1) failing to separate the proceedings into a non-jury takings phase and jury compensation phase, (2) failing to apply the correct case law from *Penn Central Transportation Company v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631

---

3. Frampton did not appeal the trial court's ruling on the median.

(1978), and (3) finding the taking endured for sixteen months. The trial court denied the motion, and this appeal followed.

## STANDARD OF REVIEW

■ "An action brought by a property owner against a [governmental entity] for the taking of the owner's property without just compensation is an action at law." *Sea Cabins on the Ocean IV Homeowners Ass'n, Inc. v. City of N. Myrtle Beach*, 337 S.C. 380, 388, 523 S.E.2d 193, 197 (Ct.App.1999) *aff'd sub nom. Sea Cabins on Ocean IV Homeowners Ass'n, Inc. v. City of N. Myrtle Beach*, 345 S.C. 418, 548 S.E.2d 595 (2001) (citing *S.C. Pub. Serv. Auth. v. Arnold*, 287 S.C. 584, 586, 340 S.E.2d 535, 537 (1986); *Poole v. Combined Util. Sys.*, 269 S.C. 271, 273–74, 237 S.E.2d 82, 83 (1977)).

■ On appeal from an action at law tried with or without a jury, the appellate court's standard of review extends only to the correction of errors of law. *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 85–86, 221 S.E.2d 773, 775 (1976). The factual findings of the jury or the trial judge will not be disturbed "unless a review of the record discloses that there is no evidence which reasonably supports [its] findings." *Id.*

## LAW/ANALYSIS

### Seating of the Jury

■ DOT contends the trial court erred in seating the jury during the takings phase. DOT maintains this error was unduly prejudicial and deprived it of a mode of trial to which it was entitled. We disagree.

■ In an inverse condemnation case, the trial court will first determine whether a claim has been established. *Cobb v. S.C. Dep't of Transp.*, 365 S.C. 360, 365, 618 S.E.2d 299, 301 (2005). Then, the issue of compensation may be submitted to a jury at either party's request. *Id.*

■ As a threshold matter, we will address Frampton's assertion that DOT did not preserve this issue for our review. Orders affecting the mode of trial affect a substantial right as defined in section 14–3–330(2) of the South Carolina Code (1976), "and must, therefore, be appealed immediately." *Lester v. Dawson*, 327 S.C. 263, 266, 491 S.E.2d 240, 241 (1997); e.g., *Foggie v. CSX Transp., Inc.*, 313 S.C. 98, 103, 431 S.E.2d

587, 590 (1993) ("Issues regarding mode of trial must be raised in the trial court at the first opportunity, and the order of the trial judge is immediately appealable."). "Moreover, the failure to timely appeal an order affecting the mode of trial effects a waiver of the right to appeal that issue." *Lester*, 327 S.C. at 266, 491 S.E.2d at 241 (citing *Foggie*, 313 S.C. at 103, 431 S.E.2d at 590).

DOT filed a motion to transfer the case to the non-jury docket on June 17, 2011. The trial court denied the motion in a Form 4 order dated September 28, 2011. DOT never appealed the trial court's order. DOT raised this issue again at trial, and the trial court again denied its request. The question before us is whether the trial court's initial order denying DOT's motion was immediately appealable.

In the case before us, DOT asserted a right to a non-jury trial for the takings phase of the inverse condemnation case. The trial court's order denied DOT's request for a non-jury trial during the takings phase and required it to go forth with a jury trial. This ruling could not be overturned by the trial judge who eventually tried the case. *See Cook v. Taylor*, 272 S.C. 536, 538, 252 S.E.2d 923, 924 (1979) (one circuit judge does not have the power to reverse an order of another circuit judge regarding the proper mode of trial); *see also Cobb v. S.C. Dep't of Transp.*, 365 S.C. 360, 363, 618 S.E.2d 299, 300 (2005) ("If an order deprives a party of a mode of trial to which that party is entitled as a matter of right, the order is immediately appealable and failure to do so forever bars appellate review."). We find DOT did not preserve this issue for our review because it did not immediately appeal the trial court's order affecting the mode of trial, which is a substantial right.

**Correct Application of Relevant Case Law**

DOT argues the trial court incorrectly applied *Byrd v. City of Hartsville*, 365 S.C. 650, 620 S.E.2d 76 (2005), and asserts the trial court should have evaluated the facts pursuant to *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) and found Frampton was not entitled to damages. We disagree.

"The South Carolina Constitution provides, '[e]xcept as otherwise provided in this Constitution, private prop-

erty shall not be taken for private use without the consent of the owner, nor for public use without just compensation being first made for the property.' " *Hilton Head Auto., LLC v. S.C. Dep't of Transp.*, 394 S.C. 27, 30, 714 S.E.2d 308, 310 (2011) (quoting S.C. Const. art. I, § 13(A)). "In an inverse condemnation action, a private property owner seeks to establish that a government entity has taken his or her property." *Id.* "The governmental conduct at issue generally takes one of two forms: (1) the entity has physically appropriated private property or (2) the entity has imposed restrictions on the use of the property that deprive the owner of the property's 'economically viable use.' " *Id.; see, e.g., Byrd*, 365 S.C. at 656–58, 620 S.E.2d at 79–80.

> Although no set formula exists for determining whether property has been 'taken' by the government, the relevant jurisprudence does provide significant guideposts. Determining whether government action effects a taking requires a court to examine the character of the government's action and the extent to which this action interferes with the owner's rights in the property as a whole.

*Hardin v. S.C. Dep't of Transp.*, 371 S.C. 598, 605, 641 S.E.2d 437, 441 (2007) (citing *Penn Central*, 438 U.S at 130–31, 98 S.Ct. 2646). "Stated more specifically, these 'ad hoc, factual inquiries' involve examining the character of the government's action, the economic impact of the action, and the degree to which the action interferes with the owner's investment-backed expectations." *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982)). "Generally, the physical occupation of private property by the government results in a taking regardless of the public interest the government's action serves." *Id.* "Additionally, the enforcement of a government regulation will usually effect a taking when the regulation denies all economically beneficial or productive use of land." *Id.* (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015–016, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). Whether physical or regulatory, permanency is not required to find a taking has occurred because "the government must compensate for even a temporary taking." *Byrd*, 365 S.C. at 657, 620 S.E.2d at 79.

DOT first claims Frampton asserted a regulatory taking. *See Kiriakides v. Sch. Dist. of Greenville Cnty.*, 382 S.C. 8, 15, 675 S.E.2d 439, 442 (2009) (stating that under a claim for regulatory inverse condemnation, *Penn Central* requires the court to look at "(1) the economic impact on the claimant, especially the extent to which the governmental entity has interfered with the claimant's investment-backed expectations, and (2) the character of the governmental action"). However, DOT does not cite any regulation or government-imposed limitation that would give rise to what it alleges is a regulatory takings claim. We disagree with any portion of DOT's argument that contends a regulatory taking analysis applies to this case. The record and Frampton's complaint reflect that Frampton premised his claim on DOT's physical appropriation of private property and not a regulatory taking. Thus, we continue our analysis using a physical taking framework.

▮▮▮ The law is clear that following *Hardin*, "a proper analysis of an inverse condemnation claim premised on an alleged physical taking must begin with a determination of the scope of the property rights at issue." *Hilton Head Auto., LLC v. S.C. Dep't of Transp.*, 394 S.C. 27, 30, 714 S.E.2d 308, 310 (2011). When analyzing what property interests exist with reference to the public road system and a property owner's access thereto, our supreme court stated the focus is on how any road re-configuration affects a property owner's easements. *Hardin*, 371 S.C. at 609, 641 S.E.2d at 443. As an abutting property owner, Frampton had an "easement for access" to Folly Road.[4] *See Hilton Head Auto.*, 394 S.C. at 30–31, 714 S.E.2d at 310. If governmental action materially injured this easement, such that Frampton no longer enjoyed the reasonable means of access to which he was entitled, a physical taking has occurred. *Id.* at 31, 714 S.E.2d at 310; *see S.C. State Highway Dep't v. Allison*, 246 S.C. 389, 393, 143 S.E.2d 800, 802 (1965) ("[A]n obstruction that materially injures or deprives the abutting property owner of ingress or egress to and from his property is a 'taking' of the property, for which recovery may be had."); *Sease v. City of Spartanburg*, 242 S.C. 520, 524–25, 131 S.E.2d 683, 685 (1963) ("The

---

4. DOT concedes that Frampton, as a landowner, was entitled to an easement for access between 699 Folly and Folly Road.

protection of [the South Carolina takings clause] extends to all cases in which any of the essential elements of ownership has been destroyed or impaired as the result of the construction or maintenance of a public street."); *Brown v. Hendricks,* 211 S.C. 395, 403, 45 S.E.2d 603, 606 (1947) (" 'The accessibility of one's property may in some instances constitute a great part of its value, and to permit a material impairment of his access would result in the destruction of a great part of the value . . . and his property is therefore as effectually taken as if a physical invasion was made thereon and a physical injury done thereto.' " (quoting with approval *Foster Lumber Co. v. Ark. Valley & Western Ry. Co.,* 20 Okla. 583, 95 P. 224, 228 (1908))).

We find the trial court correctly applied the law as stated in *Hardin* and *Hilton Head Auto., LLC.* Accordingly, we affirm the trial court's application of the law to these facts.

**Proof of Taking**

▮ DOT contends that Frampton did not present sufficient evidence to support a finding of a taking of property, temporary or otherwise. We disagree.

DOT first argues the elements of eminent domain and inverse condemnation are not applicable here because DOT was exercising its separate and distinct police power. It maintains it was rerouting and diverting traffic, and Frampton is not entitled to any compensation for restrictions or damage placed upon his property by the exercise of that police power. To support its position, DOT quotes the following:

> This court has previously recognized that there is a distinction between the exercise of the police power and the exercise of the power of eminent domain; that just compensation is required in the case of the exercise of eminent domain but not for the loss by the property owner which results from the constitutional exercise of the police power.

*S.C. State Highway Dep't v. Wilson,* 254 S.C. 360, 365, 175 S.E.2d 391, 394 (1970) (citing *Richards v. City of Columbia,* 227 S.C. 538, 547–48, 88 S.E.2d 683, 687 (1955); *Edens v. City of Columbia,* 228 S.C. 563, 571, 91 S.E.2d 280, 282–83 (1956)). We disagree with DOT's position. Frampton never contended the redirecting or rerouting of traffic caused his damage or constituted a taking. The record reflects that Frampton argued and continues to argue that DOT's construction and

related activities blocked his easement for access to 699 Folly such that it constituted a physical taking. Because we do not believe DOT was asserting its police power under these facts, we will analyze the law regarding takings in South Carolina.

DOT maintains that even if *Hardin* applies, Frampton's claim centers around the silt fence placed during construction and argues there are at least two reasons this claim is not supported by the evidence. First, it contends the real issue "is not that the fence was placed, but that it was not removed during the construction period," and thus, there is no affirmative governmental action to constitute a taking. It then contends the equitable defense of laches is applicable. We disagree with its first argument and find its second argument was not preserved for our review.

DOT attempts to avoid liability by stating while the initial placement of the silt fence may have been an affirmative action, Frampton's complaint is about the passive event of not taking down the silt fence. However, we do not believe that is an accurate representation of Frampton's claim. Frampton complains there was no access to 699 Folly during DOT's construction from various actions of DOT and its contractors, including the placement of the silt fence. To prove a physical taking, Frampton must show governmental action materially injured his access easement, such that he could no longer enjoy the reasonable means of access to which he is entitled. *See Hilton Head Auto.*, 394 S.C. at 30–31, 714 S.E.2d at 310. Despite DOT's contention that Frampton never requested the silt fence be moved to gain access to 699 Folly, case law does not require the property owner to make such a request before bringing an action at law for a taking. DOT further argues the contractors and subcontractors on the project never refused entrance to 699 Folly to anyone with rights to enter the property. Even if this were true, Frampton testified and provided pictures of constant disturbance and blockage around the access point to 699 Folly. He also testified that when contractors were asked to move their equipment, other contractors would almost immediately move different equipment into the easement for access. Thus, we find this first argument is without merit.

■ Second, DOT contends the equitable defense of laches is applicable. A review of the record reflects that this argument was not raised to the trial court. Accordingly, we find this argument was not preserved for appellate review. *See Hill v. S.C. Dep't of Health and Envtl. Control*, 389 S.C. 1, 21, 698 S.E.2d 612, 623 (2010) ("[T]o preserve an issue for appellate review, a matter may not be raised for the first time on appeal, but must have been both raised to and ruled upon by the trial court.").

For the forgoing reasons, we hold there was sufficient evidence in the record to support the trial court's finding of a taking, and thus, we affirm the trial court's decision.

Finally, DOT states that even if this court finds there is evidence to support a taking, the evidence does not support the finding that the taking existed for sixteen months. However, Frampton testified his tenant paid rent through October of 2008 and left prior to the lease terminating because of the taking. Frampton provided many photographs depicting the activities from construction that blocked the ingress and egress from 699 Folly to Folly Road. After a short marketing period following the reestablishment of access to 699 Folly, his next tenant occupied the property beginning in March of 2010. We find there is evidence in the record to support the trial court's determination of the duration of the taking.

Accordingly, we affirm the trial court's finding of a taking for a length of sixteen months.

**Excessive Jury Verdict**

■ DOT argues that even if the trial court properly found that a taking occurred, this court should reduce the jury's verdict because it was excessive and outside the scope of any credible evidence. We disagree.

■ DOT opposes the method by which Harnett calculated Frampton's damages caused by the taking of 699 Folly's easement for access. Harnett explained his methodology in detail, and DOT had the opportunity to fully cross-examine him and discredit any portion of his testimony. The jury chose to believe and use Harnett's assessment of the damages, and this court may not second-guess determination of credibility by the trier of fact. *See Hobgood v. Pennington*, 300 S.C.

309, 313, 387 S.E.2d 690, 692 (Ct.App.1989) ("If there is any evidence to sustain the factual findings implicit in the jury's verdict, this court must affirm.").

DOT also argues the rate of interest used by Harnett was improper and maintains the trial court should have taken judicial notice that the market interest rates in the 2008–2009 time period were minimal. We disagree.

"South Carolina case law implies that interest recoverable in inverse condemnation actions is an issue to be charged to the jury for its determination as a measure of damages." *Vick v. S.C. Dep't of Transp.*, 347 S.C. 470, 481, 556 S.E.2d 693, 699 (Ct.App.2001); *see S.C. State Highway Dep't v. Miller*, 237 S.C. 386, 392, 117 S.E.2d 561, 564 (1960) (stating, "[a]ssuming, without deciding," that interest was recoverable, "it was the duty of the respondents to call the matter of interest on the award to the attention of the trial [j]udge and request an instruction upon such so that the jury could, by their verdict, determine what was 'just compensation' "). "Moreover, '[t]he court may even consider the market rate of interest rather than the statutory legal rate, if that will be required to compensate the plaintiff fully.' " *Id.* (quoting 11 S.C. Juris. *Damages* § 8(a)).

Despite DOT's argument on appeal, the record reflects DOT agreed to allow Frampton to argue to the jury that he could have earned eight percent on any damages to which he may be entitled. Further, DOT did not object to the charge regarding the interest rate or request that judicial notice be taken of the market interest rates from 2008 to 2009. Therefore, we hold the trial court was within its authority to allow Frampton's expert to testify as to his opinion of the interest rate.

*Attorney's Fees and Costs*

DOT contends the trial court erred in awarding attorney's fees and costs pursuant to section 28–11–30 of the South Carolina Code (Supp.2012). DOT maintains section 28–2–510 of the South Carolina Code (2007) is the applicable statute. It argues that under these facts, Frampton was not the prevailing party as set forth in section 28–2–510, and, thus, he was not entitled to attorney's fees and costs. We disagree.

The pertinent portion of section 28–11–30, entitled "Reimbursement of property owners for certain expenses," provides

To the extent that Title III of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Public Law 91–646) makes certain requirements pertaining to the acquisition of real property by states prerequisites to federal aid to such states in programs or projects involving the acquisition of real property for public uses, state agencies and instrumentalities and political subdivisions and local government agencies and instrumentalities involved in these programs or projects may expend available public funds as provided in this section, whether or not the program or project is federally aided.

. . . .

(3) Where an inverse condemnation proceeding is instituted by the owner of a right, title, or interest in real property because of use of his property in a program or project, the court, rendering a judgment for the plaintiff in the proceeding and awarding compensation for the taking of property, or the attorney effecting a settlement of a proceeding, shall determine and award or allow to the plaintiff, as a part of the judgment or settlement, a sum that will, in the opinion of the court or the agency's attorney, reimburse the plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees actually incurred because of the proceeding.

§ 28–11–30.

DOT maintains section 28–2–510 under the Eminent Domain Procedure Act is the appropriate statute to use in determining attorney's fees under these facts because it is the more specific statute. Section 28–2–510, entitled "Award of costs and litigation expenses; procedures; prevailing landowner defined," provides

(A) If, in the action challenging the condemnor's right to take, the court determines that the condemnor has no right to take all or part of any landowner's property, the landowner's reasonable costs and litigation expenses incurred therein must be awarded to the landowner. If the court determines the right to take issue was not raised and litigated in good faith by the landowner, the court must award the condemnor the reasonable costs and litigation expenses incurred therein.

(B)(1) A landowner who prevails in the trial of a condemnation action, in addition to his compensation for the property, may recover his reasonable litigation expenses by serving on the condemnor and filing with the clerk of court an application therefor within fifteen days after the entry of the judgment. . . .

(2) For the purpose of this section, "prevails" means that the compensation awarded (other than by settlement) for the property, exclusive of interest, is at least as close to the highest valuation of the property that is attested to at trial on behalf of the landowner as it is to the highest valuation of the property that is attested to at trial on behalf of the condemnor.

§ 28–2–510.

We believe section 28–11–30 is the more specific statute. The statute expressly addresses a landowner's ability to receive attorney's fees and costs as a result of prevailing in an inverse condemnation case. *See Wooten ex rel. Wooten v. S.C. Dep't of Transp.*, 333 S.C. 464, 468, 511 S.E.2d 355, 357 (1999) (a specific statutory provision prevails over a more general one).

Further, we are concerned that by applying the language of section 28–2–510 to inverse condemnation cases, a landowner would be forced to essentially "bet against himself." Unlike in a typical condemnation case, where the government and the landowner simply disagree on the value of the land taken, in most inverse condemnation cases, the government denies there was a taking at all, and thus, its valuation of the land is zero. The landowner must then foresee whether the jury would award a judgment at least as close to the highest valuation of the property attested to on his behalf as it is to the likely zero valuation of the property attested to by the government.

Moreover, the landowner in an inverse condemnation case must first establish a taking occurred, a requirement that is not usually present for a landowner in a typical condemnation case. Applying the prevailing party definition of section 28–2–510 to inverse condemnation cases would place a heavier burden on landowners in inverse condemnation cases, a result that we do not think was intended by our legislature.

Based on the forgoing reasons, we find the trial court applied the correct statute in determining whether Frampton was entitled to attorney's fees. Accordingly, we affirm the trial court's decision.

## CONCLUSION

For the forgoing reasons, we find DOT did not preserve its arguments regarding prejudice resulting from the failure to hold a non-jury takings phase, the defense of laches, and the interest rate testified. to by Harnett. As to its remaining arguments, we affirm the trial court.

HUFF and GEATHERS, JJ., concur.